## Moorhead *v.* Scovel, Appellant.

*Deeds—Mental capacity—Lunacy—Evidence—Equity—Bill to set aside deed.*

In the absence of a fraud or undue influence mere weakness of intellect from sickness or old age is no ground for avoiding a deed.

It is not necessary that a person about to execute a deed should have sufficient mental capacity to take into connected view the whole of his property. If he understands in detail all his separate items of property and chooses with understanding and reason between one disposition and another, it is sufficient.

Mental capacity to execute a deed does not include the ability to understand the legal effect which lawyers may impart to the words employed. If the nature and effect of the instrument as a conveyance of property is understood, it is sufficient.

An opinion as to mental incapacity to make a deed, not based upon sufficient facts, or based upon an erroneous conception as to what in law constitutes such mental incapacity, must have but little weight, and must necessarily be disregarded where the evidence shows the presence of those facts and conditions which accompany and constitute mental capacity.

In a proceeding to set aside the deed of an unmarried elderly woman without near kin dependent upon her after her death, on the ground of mental incapacity, it appeared, that the deed was executed in favor of a charity in which she had long been interested. The allegation of want of capacity was based upon the opinions of several witnesses, three of whom were physicians, who could not, however, say that they saw her within a month from the time when the deed was executed. Fifteen or sixteen witnesses, many of whom had been closely associated with her for years, and had the fullest opportunity of observing her both day and night for days and weeks preceding, as well as at the time of the execution of the deed, testified particularly and in detail to the soundness of her mind, the clearness of her memory, and her ability to transact business of any kind when she executed the deed. *Held*, that there was not sufficient proof of mental incapacity to set aside the deed.

Argued Oct. 31, 1904.   Appeal, Nos. 174 and 177, Oct. T., 1904, by defendants, from decree of C. P. No. 2, Allegheny Co., Jan. T., 1904, No. 635, on bill in equity in case of William J. Moorhead et al. and the Fidelity Title & Trust Company of Pittsburg, administrator of Mary E. Moorhead, deceased, v. Elizabeth J. Scovel, individually and as Trustee, and the Safe Deposit & Trust Company of Pittsburg.    Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT, POTTER and THOMPSON, JJ.    Reversed.

Bill in equity to set aside a deed.   Before FRAZER, P. J. The facts are stated in the opinion of the Supreme Court. The court entered a decree in favor of the complainants.

*Errors assigned* were the various findings and conclusions and the decree of the court below.

*John S. Ferguson*, with him *W. J. Stevenson*, for appellant.

*Thomas Patterson* of *Patterson, Sterrett & Acheson*, for appellee.

OPINION BY MR. JUSTICE POTTER, December 31, 1904:

The first seven findings of fact in this case, as stated by the learned judge of the court of common pleas, are in accordance with the undisputed testimony.   But we are unable to concur with him as to the remaining three findings, the eighth, ninth and tenth.   Our examination of the testimony has led us to an entirely different conclusion as to these findings of fact, and, therefore, in consequence to an entirely different conclusion of law, from that reached by the court below, based upon the findings of fact as a whole.   For instance, in the eighth, it is found as a fact that after August 1, 1903, Miss Moorhead's "condition became such as to render impossible any extended or connected train of thought, or the discussion and determination of matters of importance at all complicated in their nature, or requiring thought and recollection."   " After that date, August 5, her ideas were irregular and she was not capable of continuous or concentrated thought, and entirely unable to transact business and especially to dispose of property."   " Dur-

ing almost the entire time between the latter part of August and her death she was in a semi-comatose condition."

These findings ignore the direct and positive evidence of some fifteen witnesses called by the defendant, who testified to the contrary, and even go beyond the testimony of the three physicians upon whose opinions the complainants rested their case.

The bill was filed for the purpose of having declared void a deed executed by Mary E. Moorhead, upon September 16, 1903. The case for plaintiffs was based entirely upon the allegation that owing to her weak mental and physical condition she was not competent either on September 15 or 16, 1903, to make a deed or any binding contract whatever. No charge of exercising undue influence over her is made against anyone in the bill, nor is there any proof that any person sought unduly to influence or control Miss Moorhead, in the execution of the deed in question. No allegation is made in the bill that Miss Moorhead was insane, or that disease had destroyed her mental capacity. It was the degree of her capacity only which was questioned. The charge was that she had not at the time sufficient capacity to understand the nature of the act she was doing when she executed the deed.

None of the witnesses for plaintiffs were present either on September 15, when the instructions for the preparation of the deed were given by Miss Moorhead to her attorney, or upon the next day, when it was executed and acknowledged. From such general knowledge and observation of her mental and physical condition, as could be gathered at occasional visits, they were permitted to express opinions that Miss Moorhead lacked a proper understanding of what she was doing when she executed the conveyance. Such testimony as this is entitled to but little weight as against the positive evidence of those who were in constant attendance upon her day and night, and who knew from direct observation what her condition was when the deed was made and what it was for days and weeks afterwards. It will be remembered that Miss Moorhead lived some six weeks after the deed was executed.

The evidence to sustain the plaintiffs' contention consisted mainly of the opinions of three physicians. One of these, Doctor Murdoch, testified in substance that he saw deceased

about once in every two weeks during her illness. But he could not fix any dates. He said that she showed lack of decision, loss of memory and lack of judgment. She was uncertain as to whether she ought to have the services of a physician, because she had put herself in the hands of the Lord. He said she was drowsy and stupid a great deal of the time. In asking questions she confused the aunt of witness with his mother. While this witness could not remember the dates upon which he saw Miss Moorhead, yet in his opinion she was so enfeebled on September 15, 1903, that she could not comprehend the details of the deed.

Doctor J. H. Anderson saw Miss Moorhead upon an average of once in every three to five days during her illness, except from August 5 to August 22. Saw her upon September 11 and September 15 and then upon September 21. In his opinion she was not in condition upon September 15 to understand the full import of the deed. Upon cross-examination the witness admitted that it was quite likely he had said in September that it was remarkable how clear her mind was.

Doctor Donaldson only attended Miss Moorhead during the vacation of Doctor Anderson, from August 5 to August 22. During that period, in his opinion she was not in mental condition to comprehend an act such as the execution of a deed. It was while Doctor Donaldson was attending her that deceased suffered the most severe attack of her illness. But she afterwards rallied. This witness knew nothing, of course, as to her condition in fact, at the time of the execution of the deed.

George B. Logan, another witness, saw deceased on the last Saturday in August. He said she was apparently a woman of sound, clear mind, but by reason of her sickness he would not consider her then in condition to decide an important matter. His opinion was based on her weak physical condition. He of course did not know her mental condition on September 15 or 16.

The physicians were not sent for by Miss Moorhead, but Doctor Murdoch, who was her nephew, came of his own accord, and he instructed Doctor Anderson to visit her. The visits were made only at considerable intervals of time and seem to have been quite as much of a social as of a professional character.

We doubt very much if the knowledge gained by his occasional visits of this character, constituted a sufficient basis upon which to express any opinion as to Miss Moorhead's mental capacity at the time when the deed was executed; the physicians not being then present and not knowing as a matter of fact what her mental condition then was. It was the mental capacity of Miss Moorhead upon September 15 and 16 and upon the dates when the assignments were executed, which was in question. Evidence as to her condition at other times was only important as it shed light upon her condition on those dates.

The facts given in evidence by the physicians as to her physical weakness, when they saw her, do not seem to us to warrant the inference of imbecility of mind, either at those times or at any other.

There is no evidence that any of the medical witnesses attempted in any way, purposely, to test the mental capacity of Miss Moorhead. No doubt she was physically weak, and the disease may have weakened her mental perceptions at certain times. But the authorities are ample, that in the absence of fraud or undue influence, mere weakness of intellect, resulting from sickness or old age, is no ground for avoiding a deed.

Judging from the testimony, it is by no means clear that these witnesses had a correct conception of what in law would constitute mental capacity. For example, Doctor Anderson admitted upon cross-examination that she would probably know about her separate pieces of property in detail, if asked about them one at a time, but thought she could not take a connected view of the whole. But to require her to do this was going beyond the legal standard. No such comprehensive mental grasp is required as the test of capacity to make a will or a deed. Speaking of testamentary capacity in McMasters v. Blair, 29 Pa. 298, this court said: "To understand in detail all that he is about is quite sufficient." And in Daniel v. Daniel, 39 Pa. 191, it was said that it was not necessary to collect in one review, knowledge of the property possessed, understanding of the disposition to be made of it, and of the persons and objects to whom it was to go. "It is not necessary he should collect all these in one review. If he understands in detail all he is about and chooses with understanding and reason between one disposition and another it is sufficient."

The only question before the court was whether Miss Moorhead had sufficient capacity to understand in a reasonable manner, the nature of the act she was doing, and the nature and effect of the deed she was executing.  Yet an entirely different inquiry was presented for the opinion of these witnesses in the form of the question put by plaintiffs' counsel to Doctor Anderson as follows: "Q. Mr. Ferguson has asked you in detail as to her pieces of property, and asked you whether or not Miss Moorhead knew she had this piece or that piece, to which you have answered perhaps she did.  I ask you again whether, taking this instrument in its entirety, with all various properties, covering some two pages, and its directions, covering some two pages more, in your opinion was Miss Moorhead able in one mental act to comprehend the meaning of that instrument?  And in the question submitted to Doctor Murdoch, "I show you a copy of a deed dated September 15, and I ask you whether in your opinion at the time of the date of that deed Miss Moorhead was able to understand and comprehendingly act upon an instrument of that kind?"

In each of these questions there was a shifting of the inquiry from the mental capacity to comprehend the effect of an ordinary business transaction, to her ability to understand the form and arrangement and technical language of the instrument of conveyance.  Every business man knows what it means to make a deed, for his property, but what does he know of the formal parts of the instrument?  When he is said to understand a deed, it is never meant that he comprehends the legal effect which lawyers may impart to the words employed.  Mental capacity to execute a deed does not include any such ability as that.  If the nature and effect of the instrument as a conveyance of property is understood it is sufficient.  If Miss Moorhead understood the design and effect of her act in executing the papers it was all that was required.  The facts attending the preparation of the deed, by her own attorney, after full discussion and explanation, and in pursuance of her desires as expressed to him, seem not to have been considered or taken into acount by the medical men in expressing their opinions as to her comprehension of each meaning and effect.  Yet these were very important elements.  Her knowledge of the instrument probably came to her largely through the reading and explanation of it

to her by her counsel; and not from personal examination or study of it. Her ability to intelligently convey property was not to be gauged by her understanding of legal verbiage, or the technical details of description or otherwise as set forth in the deed.

As was stated in an opinion in Klein's Estate, 207 Pa. 191, approved by this court, "an opinion as to mental testamentary incapacity not based upon sufficient facts, or based upon an erroneous conception as to what in law constitutes testamentary incapacity, must have but little weight and must necessarily be disregarded where the evidence shows the presence of those facts and conditions which accompany and constitute mental capacity."

Turning now to the testimony on behalf of the defendants, we have fifteen or sixteen witnesses, many of whom had been closely associated with Miss Moorhead for years, and had the fullest opportunity of observing her both day and night, for days and weeks preceding, as well as at the time of the execution of the papers in question. They recount her words and her conduct with great particularity; all believe her to have been of sound mind and clear memory, able to transact business of any kind when she executed the deed. We are unable to understand how such testimony can be set aside, when every witness appears to have been respectable and no attack is made upon the credibility of any of them. We quote the substance of the testimony of a few of them.

Rev. C. W. Ferguson, a minister of the gospel, associated with the work of Bethany Home: He made the first suggestion of the deed at deceased's request. Saw deceased frequently throughout her illness and talked with her. Was present when the deed was executed. Deceased knew what she was doing and her mind was perfectly clear. She understood the transaction fully. Remarkable thing in her sickness was that after a sinking spell she would rally so quickly and with so clear a mind.

W. J. Stevenson, the lawyer who drew the deed, had been consulted professionally by deceased for several years: Went out to see her on September 15, prepared pencil draft of deed and read it to Miss Moorhead and explained it to see that it met her wishes. Discussed particularly the insertion of the

trust clause, also other parts. Had the deed typewritten and took it back for execution next day. Explained the deed fully to her both before and after it was finally written, and read the essential parts. She showed no listlessness or inattention. Took great interest in the transaction, and discussed certain features quite fully. She possessed mental capacity to understand the nature of the act in which she was engaged. She was much stronger on the 16th than on the day before. After I had read the deed to her I asked her if it was all right, and she said that it was. I asked if she would execute it, and she said " Yes." I said she could make her mark. " Oh, no," she said, " I can write—" and I told her that perhaps she had better not sit up to write her name, that the mark would be legal. I understood from the nature of her disease it would be better for her not to sit up.

Flora C. Sweet: Had lived at Bethany ten years. Saw deceased daily up to the last day of September. Conversed with her constantly. On September 15 and 16 she was of sound mind and able to execute business of any kind.

Minnie Drinkard, a nurse : Lived at Bethany eight years. She saw deceased daily ; says Miss Moorhead was of sound mind until November 1, at least ; gave instances of her mental capacity.

Mary E. Rawson, also a nurse : Attended deceased in September. No question about her mind being perfectly straight and natural. Had long conversation with her on September 16, which witness gave in detail.

Fannie D. Nelson : Saw deceased daily. In September had conversation with her. She was weak in body but her mind was clear ; ready to take in all that was said and to show interest. She had always been a woman of clear mind and good business capacity. In September her mind was as sound as it had ever been. She was perfectly able to appreciate and understand the act of making the deed.

Elmira T. Moreland, a friend of deceased : Saw her September 20 and latter part of October. Showed no lack of interest or attention. Was weak physically, but showed brightness, clearness and grasp of things all around. Was as clear in mind as she ever was in the eighteen years witness knew her.

Violet Edmunds : Lived at Bethany seventeen years. Gave instances of deceased's mental capacity in September as she read from a book in dialect.

Lillie Strickland : Was a visitor at Bethany from July to November. Saw deceased a dozen times. Had conversations with her on September 20 and later. Detailed same. Miss Moorhead's mind was very clear, always when witness saw her. Regarded her as perfectly capable to comprehend the transfer of real estate and bonds.

There was much more evidence to the same effect.

Referring again to the eighth finding of fact it is stated: " On September 9 and 10 Miss Moorhead experienced two severe hemorrhages, which rendered her condition so critical that she was believed to be dying, and her relatives were sent for. These were followed by another hemorrhage on September 15, from the effects of which she could only be aroused with difficulty." We cannot find any evidence, on either side, to sustain these findings as they stand. The only testimony we find on the subject is that of Miss Minnie Drinkard, who said that Miss Moorhead had a hemorrhage about September 10 or 11. Witness' recollection was that she had none on September 15, 16 or 17. The occasion when her family were sent for was in August, more than a month before the deed was made. Both sides agree that after the severe attack in August there was a great improvement in her condition.

In the next finding of fact, also numbered eight by mistake, it is found that " these papers were suggested by Miss Scovel and Mr. Ferguson, and their preparation supervised by them, and their execution by Miss Moorhead made at a time when she was unable to fully comprehend their substance and effect without independent or disinterested advice."

The evidence is uncontradicted that the deed of September 15 was not suggested by Miss Scovel, but that the suggestion was made by Mr. Ferguson in answer to Miss Moorhead's expressed desire to carry out in her lifetime the provisions for the work at Bethany Home, which she had previously arranged for in her will. His suggestion was that she should carry out her will in that way, that is, by making a deed. Miss Scovel first learned from Miss Moorhead herself of her intention to make the conveyance. It is also the fact that Miss Moorhead

had the advice of her attorney, who went over the draft of the deed with her and discussed its terms at length before having it typewritten and read it to her again before its execution. The evidence as to this fact is directly opposed also to the last finding of fact, by the trial judge, in that it appeared clearly from the evidence that she had the benefit of the advice of her counsel before, and at the time of the execution of all the papers in question.

As to the conclusions of law, we are not able to draw from the evidence any justification of the statement that "Miss Moorhead's general condition, at the time of executing the papers of September 15 and 28, and October 30, appears to have been such as to preclude her from intelligently originating, understanding or executing the same." As we have pointed out, the weight of the evidence is, in our opinion, overwhelmingly to the contrary. It may be admitted that the relations between Miss Moorhead and Miss Scovel were confidential. That Miss Scovel was her trusted friend and close companion. They had worked together for long years, in a cause that was dear to the hearts of both, and which constituted Miss Moorhead's chief interest in life. It is not charged in the bill by plaintiffs nor is there a word in the testimony intimating that Miss Scovel ever exercised any influence over Miss Moorhead which in the legal sense of the word could be termed "undue." Whatever burden of disproving undue influence was placed upon Miss Scovel by the mere fact of the existence of the confidential relation has, as we regard the evidence, been completely met. In addition to her own denial, Miss Scovel has shown by disinterested witnesses that the deed and assignments were merely the carrying out of an intention formed by Miss Moorhead long before, expressed frequently, and embodied, together with her reasons, in her will, which was written with her own hand and executed March 3, 1902.

As we have already said, some fifteen witnesses who saw her more or less frequently during her last illness, some almost daily, testified that at the time the papers were executed her mind was perfectly clear, and that she was able to understand what she was doing and what the results of her acts would be. She had formed, years before, the purpose which the conveyances carried into effect. They were in accord with the ef-

forts to which she had devoted more than fifteen years of her life. Unmarried, with no one of her father's family dependent upon her, or in need, what could be more reasonable than that she should devote the greater part of her wealth to the continuance of the religious and charitable work which she had founded, and to which while living she had consecrated herself and her means? The Bethany Home was the child of her affections. Her reasons for giving to Miss Scovel the absolute control of the property left to carry on the work are fully set forth in her will which was offered in evidence. Miss Scovel testifies that she had no part in the preparation of the will, and had no knowledge of its contents until Miss Moorhead told her of it long after it was executed.

As we have considered only the questions arising upon the merits of this case, we do not deem it necessary to take up the assignments of error in detail. The twenty-first and twenty-second assignments are sustained, and the decree of the court below is reversed. It is now ordered, adjudged and decreed that the bill be dismissed and that the injunction be dissolved and that the costs of the proceedings in the court below, and upon this appeal, be paid by the appellees who were complainants in the bill as originally filed in this case.