## Mead v. Sherwin et al., Appellants.

*Trusts and trustees—Deed of trust—Mental capacity of settlor —Evidence—Burden of proof—Witness—Competency—Party dead —Findings of fact—Equity—Appeals.*

1. On a bill in equity to set aside a deed of trust on account of the mental incapacity of the settlor, the appellate court will not consider the question of where the burden of proof rested, where it appears that the plaintiff assumed the burden, that no request was made that it be shifted to defendants by reason of a confidential relation with the settlor, and that the conclusion of the court that the settlor was mentally incompetent was reached without reference to the question of shifting the burden to defendants.

2. The appellate court will not consider the question of the competency of the plaintiff and the defendant trustee in such case, where the court below states that it reached its conclusion on the testimony of other witnesses alone, without reference to that of the parties of record; and this is especially so where no objection was made to plaintiff's testimony until after the trial, and the court states that it considered the testimony of defendant incompetent and had not depended upon it.

3. The appellate court will not reverse a finding of a chancellor as to the mental incapacity of the settlor in a deed of trust, where the finding is based upon sufficient and competent testimony, and there is no manifest error or abuse of discretion.

4. In such case the appellate court will not substitute its judgment on the facts for the judgment of the court below, but will give the findings the effect of a verdict of a jury.

*Equity—Trust and trustees—Deed of trust—Setting aside deed —Duty of trustee to uphold. trust—Costs—Cestuis que trust to pay costs—Discretion.*

5. In equity cases the disposal of costs is in the sound discretion of the chancellor, to be determined according to the justice of each particular case; and the appellate court will not interfere with the exercise of such discretion unless clear abuse appears.

6. A trustee owes to those interested the duty of upholding the trust where it is attacked.

7. If he acts in good faith he should be allowed costs out of the trust estate, even though the proceedings terminate adversely to him.

8. On a bill in equity to set aside a deed of trust after the settlor's death, on account of the latter's mental incapacity, where the trustee and the cestuis que trust are made parties defendant, and the whole fund in the trustee's hands is involved, and the suit goes against defendants, and is appealed, the costs will not be imposed upon the trustee, but upon the cestuis que trust who were parties of record and who joined in the answer and the appeal.

Argued May 10, 1922. Appeal, No. 293, Jan. T., 1922, by defendants, from decree of C. P. Erie Co., Nov. T., 1920, No. 8, on bill in equity, in case of John J. Mead, Committee of Estate of Marion H. Phelps v. J. M. Sherwin, Trustee, St. Vincent's Hospital et al. Before MOSCHZISKER, C. J., FRAZER, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Decree modified and affirmed.

Bill in equity to set aside deed of trust. Before ROSSITER, P. J.

The opinion of the Supreme Court states the facts.

Decree for plaintiffs. Defendants appealed.

*Error assigned,* inter alia, was decree, quoting it.

*W. P. Gifford,* with him *H. E. Fish,* for J. M. Sherwin, trustee, appellant.—The burden in favor of sanity was not overcome: Keller v. Lawson, 261 Pa. 489; Kesler v. Hugus, 271 Pa. 512; Gongaware v. Donehoo, 255 Pa. 502; Moorhead v. Scovel, 210 Pa. 446; Shreiner v. Shreiner, 178 Pa. 57; Aiman v. Stout, 42 Pa. 114; Graham v. Pancoast, 30 Pa. 89.

*Robert L. Roberts* and *S. L. Gilson,* for Erie Young Men's Christian Association, appellant.

*George M. Mason,* for Erie Home for the Friendless, Florence Crittenton Home, First Methodist Episcopal Church of Erie, appellant.

*A. W. Mitchell,* for Boys' Club of Erie, appellant.

*A. O. Chapin,* for Erie Board of Education appellant.

*Charles H. English,* with him *John B. Brooks,* for appellee, cited: Timmes's App., 237 Pa. 189; Roche v. Wegge, 202 Pa. 169; Gibbons v. Gibbons, 175 Pa. 475; Kedward v. Campbell, 166 Pa. 365; Butts v. Armor, 164 Pa. 73; Newhard v. Yundt, 132 Pa. 324.; Rosensteel v. Long, 65 Pa. Superior Ct. 541; Krings v. Krings, 43 Pa. Superior Ct. 590.

OPINION BY MR. JUSTICE FRAZER, September 25, 1922:

Plaintiff's bill avers his appointment, on February 2, 1920, as committee in lunacy of Marion H. Phelps, widow of Frederick S. Phelps, who died August 8, 1920, leaving a will dated April 4, 1914, republished by codicils dated respectively, March 26, 1915, and March 25, 1916, in which J. M. Sherwin, one of the defendants, was named executor and trustee; that in filing an inventory the executor failed to include 380 shares of the capital stock of the Times Publishing Company, a corporation having its principal office in the City of Erie; that, on his being cited to show cause why such stock should not be included in the list of assets of deceased, he answered stating that on May 3, 1918, Phelps transferred the stock in question, to him, as trustee, pursuant to a deed of trust wherein the income arising from the shares was directed to be paid the grantor for life and after his death a fixed sum to grantor's wife for her life, remainder in trust for the benefit of designated charitable institutions and classes of individuals, all of whom were joined as parties defendant. The bill further averred that at the time of the execution of the

deed of trust Phelps was of unsound mind and incapable of transacting business and that defendant Sherwin, an attorney and confidential advisor of Phelps, with knowledge that the latter was of unsound mind, procured the trust instrument for the purpose of securing control of the capital stock of the Times Company. The answer to the bill denied Phelps was of unsound mind at the time of executing the deed and also that Sherwin acted from improper motives. The chief issue raised in the court below, concerning which a large mass of testimony was offered on behalf of each party, was whether the evidence adduced was adequate to sustain the averment of impairment of decedent's mental capacity at the time of executing the trust deed. The court below, following an exhaustive review of the testimony submitted, concluded deceased was mentally incompetent, entered a decree declaring the deed in question void, ordered the trustee to transfer the shares of stock to himself as executor and directed him to pay all costs. From this decree Sherwin, as trustee, and the charities mentioned in the deed of trust, who joined in the answer to the bill, have appealed.

Before discussing the mental capacity of deceased we deem it advisable to consider and dispose of these preliminary questions (1) upon whom the burden of proof rested and (2) the competency as witnesses of Mead and Sherwin. The first question was raised and discussed by counsel in the court below and on this appeal. In view of the statement by the court that this burden proof was assumed by plaintiff,—and there was no request that it shifted to defendants by reason of the existence of a confidential relation between deceased and the trustee, nor was there evidence of undue influence,—and that the conclusion of the court was reached without reference to the question of the shifting of the burden to defendants, but was based entirely on the finding that the testimony on part of plaintiff "overwhelmingly outweighs the testimony on the part of defendants and establishes beyond

the peradventure of a doubt that at the time of the execution of the deed F. S. Phelps was insane and totally incapacitated to make either a will or a deed," it becomes unnecessary to further consider the question. The competency of Mead, the plaintiff, and Sherwin, the trustee, to testify, owing to the insanity and death respectively of the persons whose rights they represented, was questioned. Extended consideration of these questions is also unnecessary. The testimony of Mead was received without objection made until after trial, at which time a motion to strike out and requests for findings of fact and conclusions of law were presented. The objection came too late. Furthermore, the court below stated that, whether the evidence should be considered admissible or inadmissible, that of the remaining witnesses was alone so conclusive as to render it immaterial whether the testimony of Mead and Sherwin should be either considered or rejected. The testimony of Sherwin was received subject to exception; later, however, the court concluded the witness was incompetent and stated that had his testimony "been clearly admissible, which it was not, and had it been carefully considered, which it was, it would not have changed or in any manner modified the facts as found or the legal conclusions reached." Considering this statement by the court below without discussing or deciding the question of the competency of Sherwin, we will treat his testimony as competent in reviewing the correctness of the conclusions reached. This leaves for our discussion the mental capacity of deceased and also the final question as to whether the court below properly disposed of the costs.

On the question of mental capacity we must necessarily bear in mind the rule that in reviewing the findings of the court below in equity proceedings where the credibility of witnesses and weight to be given their testimony is involved, the appellate court will not substitute its judgment on the facts for the judgment of that court but will give those findings the effect of a verdict

of a jury and not reverse where supported by the testimony and no abuse of discretion appears: Cruzan v. Cruzan, 243 Pa. 165; McIlvaine v. Powers, 270 Pa. 341, 345. The definite question for determination is whether deceased had at the time of executing the deed of trust sufficient capacity to understand the nature and effect of the instrument: Moorhead v. Scovel, 210 Pa. 446.

Deceased had been for more than twenty-five years president of the Times Publishing Company, whose shares of stock are here in controversy, which company controlled the newspaper known as the "Erie Daily Times." He was editor of the paper, wrote its editorials, was able and aggressive and a tireless worker. Having sustained a stroke of apoplexy in 1917, which was followed by another in 1918, Phelps subsequently began to show times of mental derangement and physical weakness which gradually increased to the day of death on August 8, 1920. To this extent there is substantially no conflict in the testimony. As stated by the court below, the sole question is whether the decline in mental faculties had progressed to such extent that at the time the deed of trust was executed it can be said he had passed beyond the realm of reason and, consequently, was unable to understand and appreciate the nature of his act. On this question numerous witnesses were called on each side, approximately sixty in all. Those for plaintiff, who testified deceased was, in their opinion, insane and mentally incompetent to understand the nature of his act at the time he executed the deed, included five eminent physicians, one of whom had been deceased's family doctor for many years, and two had also attended him professionally and observed his mental condition; nine nurses, several of them having attended deceased immediately previous to his death, and a large number of business associates and employees in the office of the "Times" where deceased had spent many years of his life. To refer specifically to the testimony of these witnesses would unduly lengthen this opin-

ion. Briefly summarized, it establishes: impaired mental power; loss of memory; inability to concentrate on any matter; childish; irrational, and extremely careless in his personal habits; violent at times; would go without sufficient clothing and in various ways act like a child, in striking contrast to his former forceful character and energy; was unable to dress or feed himself, not because of want of physical ability but owing to lack of mentality; lived and dressed in a filthy state and manner and was unable to appreciate the mental condition of his wife who had been judicially declared insane; unable to recognize friends or remember their names; lack of interest in business matters that were brought to his attention and seemingly unable to understand them; inability to comprehend what was going on about him; and he did many other irrational acts indicating rapid decline of mental power.

On the other hand, defendants called a number of witnesses, four of whom were physicians and others business associates of undoubted veracity, who testified that, while deceased was mentally and physically affected, he was able to converse rationally and attend to business matters; and, in general, their testimony contradicted that of witnesses called on behalf of plaintiff. In fact the testimony of many of the witnesses was so directly opposite in its effect that the court below in its discussion stated it seldom had been called upon to consider testimony so contradictory coming from witnesses of the highest reputation and character. A significant fact, however, is that defendants' witnesses admitted deceased had been failing and gradually becoming weaker in both body and mind. In considering the weight of this conflicting evidence we cannot do better than summarize the situation by quoting the following language from the opinion of the court below: "All the witnesses who testified on the subject, testified that Phelps had mental dullness; most of them, that he had memory defects; many, that he was irritable with his wife and violent at

times with other people; that his emotions were unstable; he cried frequently; his moral sense blunted; used profanity; judgment defective, about the matter most important to him, viz, his wife's mental condition; had no will power, was swayed by an insane wife; was mentally depressed; 'despondent most all the time.' In addition to these symptoms of his mental condition, physically he had a diseased heart, arteriosclerosis of the arteries of the eye, diseased kidneys, diseased bowels, strength and endurance impaired, paralysis and arteriosclerosis generally. Just what more he could have had and still live, it is difficult for a layman to imagine, but these were sufficient, for he died from the effects of them within eighteen months.

"When we come to analyse this testimony, bearing in mind that the claim here is not that Phelps was an imbecile or an idiot, but that he was insane 'and that many acts of business could possibly be done by a lunatic and the lunacy not be detected' (which is also a matter of common knowledge), we find that, compared with his former self, the old Phelps was gone and in his place had come an entirely different personality, fraught with acts and conduct wholly inconsistent with his previous character and habits and with a total change in individuality as overwhelmingly established by the evidence of those who were closest to him and had the best opportunity of observing him. His family physician and all the other doctors who observed him or attended him professionally (except two internes), even the specialist on mental diseases from the sanitarium, said that Phelps had all the physical symptoms of arteriosclerotic insanity, of which the apoplexy was not the cause but the result. All the nurses that attended him, all his immediate business associates on the 'Times' from the editorial force down to the truck driver, including his personal stenographer, barber and all his social friends and companions, who testified on the part of the plaintiff, noted the change and testified that he was insane,

nor was that testimony confined to the plaintiff's witnesses alone, for a large number of defendants' witnesses testified that he was no longer the same, but that most, if not all, of his prominent attributes and distinguishing personalities were gone and it is ominous that covering the period in dispute his method of thought is not reflected in any manuscript; there is no dictation, the product of his mind, or rescript, the result of his thought, in all the evidence, except the letter to his sister, which may be to a large extent reflex, but in any event is puerile, when coming from a man of his admitted former mentality, and, as there was not sufficient lack of physical strength to prevent mental expression,—that is, the expression of his mental operations did not cease on account of physical disability,—there must, to account for this complete reversal of form, have been a lack of desire or lack of qualification to continue the bent of his former inclinations, and the great preponderance of the evidence clearly points to the latter. The evidence on both sides discloses, not positively on one side and negatively on the other, but positively on both, that there was a tergiversation on former pursuits, a complete metamorphosis of habits, conduct, dress, speech, manner, expression, etc. To state it briefly, he had changed from a brilliant, aggressive, cosmopolitan · gentleman to a lethargical, hebetudinous, object of pity, personally disheveled, bodily repulsive, disgustingly and nauseatingly filthy and mentally moribund, with a disease ultimately mortal."

In examining the testimony, we have not overlooked the significant fact that the provisions of the will, so far as the corporate stock here in question is concerned, were substantially identical with those contained in the deed of trust, and that deceased had frequently referred to these provisions and, on February 12, 1916, published in his newspaper a statement announcing an intention to contribute to the charities and purposes mentioned, and indicating that final disposition of the property in

question, as set forth in the deed of trust, would be in accordance with the plan adopted long before his mentality was questioned. These circumstances are strong evidence that he well knew and appreciated the effect of his act at the time of executing the deed. Its provisions may have been precisely identical with his previous declarations of intent, nevertheless, if, at the time the deed was actually executed, Phelps lacked sufficient mental capacity to know and understand the nature of his act, such act must be declared void. Insane persons frequently perform rational acts with apparent understanding of them. This often accounts for the diversity of opinion of witnesses, who are both honest and intelligent, when a question of mentality of another is concerned.

Upon consideration of the entire evidence, we are of opinion the conclusion reached by the court below is fully supported by the weight of the testimony.

The remaining question requiring consideration refers to the disposition of costs imposed by the court below on Sherwin. The rule in equity cases is that the disposal of costs is in the sound discretion of the chancellor, to be determined according to the justice of each particular case (Stocker v. Hutter, 134 Pa. 19, 27) and this court will not interfere with the exercise of such discretion unless clear abuse appears: Penna. Co. for Ins. v. Bank, 195 Pa. 34, 37; Miller v. Dilkes, 251 Pa. 44, 52. Where an executor unsuccessfully prosecutes in good faith a claim on behalf of the estate, he should not be held personally liable for costs though there is a general judgment against him; and execution for costs issues against the estate only: Callender's Admr. v. Ins. Co., 23 Pa. 471. The court may, however, order him to personally pay costs should it appear he acted without justification or ordinary prudence in presenting a claim: Pennypacker's App., 57 Pa. 114. An executor is not bound to defend his testator's will and if he undertakes to do so it must be as agent and in the interest and at the ex-

pense of those expecting to be benefited by his action, and he cannot charge the expense of a contest to the estate he represents, unless the estate is benefited by the proceedings: Titlow's Est., 163 Pa. 35; Arnold's Est., 252 Pa. 298. An exception to this rule has been recognized where a trustee accepts a trust and undertakes to carry out its provisions; in such case he owes to those interested the duty of upholding the trust in the event of an attack made against it: Alexander's Est., 211 Pa. 124. Under such circumstances a hardship on the trustee would result were he compelled to pay the costs and expenses of the contest even though it should result adversely to him and those he represents; justice, accordingly, seems to require that he be allowed out of the trust estate, or its income, a sufficient sum to reimburse him for the outlay (Bush's App., 33 Pa. 85), unless it appears his action was not in good faith for the benefit of cestuis que trust but for the purpose of furthering his private interests: Raybold v. Raybold, 20 Pa. 308. If he acts in good faith he should be allowed costs, even though the proceedings terminate adversely to him: Bush's App., supra; 39 Cyc. 646, 648.

The present case presents a situation which precludes the application of the usual rule, inasmuch as there is no trust fund out of which costs can be paid. The trust sought to be upheld has been declared void and as it covered the entire fund in the trustee's hands there remained nothing from which the court could order reimbursement, so far as the trust estate is concerned. The trustee is not charged with bad faith and we have express finding that undue influence was not exercised over the mind of deceased. Where many persons have a common interest in trust property, or fund, and one of them, for the benefit of all and at his individual cost and expense, institutes proceedings for the preservation or administration of the fund, the court of equity in which the proceeding is instituted will order that plaintiff be reimbursed his outlay from the property covered by the

trust, or by proportional contributions from those who accept the benefits of his efforts: Grier v. Union Nat. Life Ins. Co., 217 Fed. 293, 294, and cases cited. In the above cited case, however, it was properly held that, where the decree of the court below impressed funds with a trust in the hands of a receiver and ordered dis: tribution to the beneficiaries, an objecting creditor was without standing to ask that the costs of an appeal from such decree be imposed upon the fund or upon other assets in the hands of the receiver, in absence of consent of the general creditors to whom no benefit would accrue had the appeal failed. The situation is somewhat similar here. The trustee was also executor under the will of deceased and as such he now takes possession of the fund; this, however, is not because of his efforts as trustee, but notwithstanding his efforts to the contrary. While it would be unfair to the beneficiaries under the will to have the costs paid out of the fund, which as a result of these proceedings passes to them, the trustee should be entitled to reimbursement by those for whom he acted and would have benefited by the proceeding had the result been favorable to defendants. Accordingly, instead of imposing the costs on the trustee, they should have been imposed upon the defendants named as beneficiaries under the trust who actively participated in the conduct of the case.

The decree of the court below is modified and it is hereby ordered that defendants who were parties to the record in the court below and joined in the answer and in this appeal pay the costs; otherwise the decree is affirmed.