## Steinkirchner Trust

Before Zavarella, A.J., Rahauser and Boyle, JJ.

OPINION BY ZAVARELLA, A.J., SEPT. 7, 1979:

On September 14, 1973, Lillian M. Steinkirchner, as donor, executed an instrument designated "Living Trust Agreement". Marcella R. McNanamy and Albert V. Steinkirchner, as co-trustees, were to receive certain property and, pursuant to the agreement, pay to donor during her lifetime the net income from the trust property and, upon her death, to pay the remainder in one-fourth shares to donor's four children. Donor reserved the right to withdraw all or any part of the principal at any time and also retained the right to revoke, alter or amend the trust at any time upon delivery to the trustees of an instrument in writing setting forth the revocation. The trust was funded and operable during 1973 and 1974 in Pittsburgh, Pennsylvania. In July of 1974, the donor moved to California and payments by the trustees continued in California. By 1975, difficulties in requested payments were occurring, and Miss McNanamy, as co-trustee, refused to authorize certain payments. She was concerned with the danger of dissipation and donor's competency. On January 21, 1975, donor's daughter moved for the appointment of a conservator for donor. On April 14, 1975, Lloyd's Bank of California was appointed conservator of the estate of the donor by the Superior Court of the State of California for the County of Los Angeles. The appointment was pursuant to hearing and stipulation among counsel for the various parties. Prior to the appointment, i.e., on March 25, 1975, donor notified the co-trustees of her election to revoke the trust and to withdraw the entire trust estate pursuant to the agreement. The notice of revocation was prepared and notarized by Ray F. McAllister, Esquire, of Pasadena, California, after meetings and discussions with donor. The notice was as follows: ***

This notice was not honored by Miss McNanamy. In December of 1975, pursuant to the stipulation and order of the California court, the conservator also delivered a notice of revocation to the trustees. Miss McNanamy did not honor the notice. It was and is the position of Miss McNanamy that donor was not competent to revoke the trust and the conservator has no standing to petition in Pennsylvania for the termination. The controversy thus raises the following questions for determination:

1. Did donor have the capacity to revoke the trust?
2. What test is to be applied to determine capacity?
3. Who has the initial burden of proof?
4. May the conservator, if donor lacks capacity, revoke the trust?

There is no question of incapacity at the time the donor executed the agreement, nor is there any question that the trust may be revoked if donor possessed capacity.

Those seeking to revoke the trust argue that the "Living Trust Agreement" is testamentary in character and is a will substitute thus bringing into this controversy the capacity tests of intelligent knowledge regarding the natural objects of bounty, the general composition of one's estate, and what one desires to do with it. They argue that the standard for determining capacity in this controversy is less than the standard for determining general mental capacity.

The trustee argues, in order to revoke, donor must be able to transact business and normal financial affairs; in other words, greater capacity than that required to execute a valid will.

As to the capacity question, Pennsylvania law requires that, on the date of execution, a person executing a trust agreement must possess mental capacity, i.e., the ability to understand and appreciate the nature and effect of the trust agreement: *Girsh Trust,* 410 Pa. 455; *Mead v. Sherwin,* 275 Pa. 146. A donor must possess sufficient mental capacity to know and understand the nature of his act. If he does not, the act is to be declared void.

It follows, therefore, if a person, to execute a valid trust, must understand and appreciate the effect of the trust agreement, then in order effectively to revoke the agreement, the person must have the ability to understand and appreciate the effect of the revocation. If there has been a decline in mental facilities and if the decline has progressed to such an extent that, at the time the revocation was executed, donor had passed beyond the realm of reason then there cannot be an understanding and appreciation of the revocation: *Mead v. Sherwin,* supra. This is the standard applicable to this controversy.

32

As to the initial burden of proof, despite the language of *Girsh* and *Mead,* supra, which speak of wills and trusts in the same sense, it is also the law of Pennsylvania that, ordinarily, the mental competency of a person who executes an instrument is presumed and the burden of proof is upon the person who alleges incompetency: *Girsh,* supra, at 408. Here the trustee argues that, because of the California appointment nine days after donor executed the revocation, the burden of proof shifts to the proponents of the revocation. In Pennsylvania an adjudication of incompetency operates prospectively only. This alone maintains the initial burden of proof upon the trustee. Additionally, the record of the California appointment does not indicate that donor was a person for whom a guardian could have been appointed under California statutes. Absent such a finding, there is no adjudication of incompetency and the conservatee retains even the ability to contract: *Board of Regents v. Dover,* 120 Cal. Rptr. 407, 533 P2d 1047 (1975). If a finding of incompetency had been made, or if general unsoundness of mind was established, the rule would be otherwise.

As to the shifting of the burden of proof and capacity of donor, *Girsh Estate,* supra, is again applicable for as stated therein, "The rule in cases involving wills and cases involving deeds or contracts is the same in this respect.", p. 469. This part of the controversy presents a serious conflict. Donor's daughter, who was in a position to observe her mother's conduct at appropriate times, by deposition testimony, stated that donor could not manage her own property; could not make or communicate responsible decisions concerning her estate; could not shop; did not recognize members of her own family, or know her address and the ages of her children, and, in general, stated that her mother could not have understood the nature of the revocation. Donor's son personally testified that, during 1974 and 1975, he lived with his mother and she did not recognize him at all times; her condition was worsening; she was unsure as to the death of her husband; could not shop or make change or write a check; was forgetful and understood neither the conservatorship proceeding or the revocation.

Robert Ball, president of donor's family corporation, and a long time acquaintance of donor, observed her at a Cali-

fornia meeting of the corporation in January of 1975 and testified that she did not have a grasp of things and had to be told how to conduct the meeting.

Miss McNanamy, donor's attorney for years, was also present at the meeting and, according to her, donor did not comprehend what was happening at the meeting. Moreover, at a previous dinner, she did not recognize her daughter and, at the conservatorship hearing, donor did not appear to understand. Donor, according to Miss McNanamy, could not have understood the revocation.

Doctors Blumenthal and Walsh, both psychiatrists, testified, in response to hypothetical questions, that Donor was incompetent and could not have understood the revocation.

Does the testimony presented on behalf of the trustee shift the burden of proof? It is determined that the burden has shifted.

While it is true, as argued by counsel for petitioner, that *Girsh*, súpra, and the cases cited therein refer to general or habitual unsoundness of mind or imbecility and serious mental illness; and that fragmentary evidence of mental weakness is not sufficient to shift the burden, this controversy presents more than unrelated instances of mental weakness. Donor was elderly; she was forgetful; she required assistance to live and manage her affairs, and she was of sufficient concern to her family and friends to be a party to a conservatorship proceeding.

These items alone may not prove incapacity, but together they do, at least, indicate a worsening of her condition from the time the trust was executed and the revocation given, sufficient to require the introduction of clear proof by petitioner. Capacity does exist despite the infirmities of old age, but it must be shown.

To this end, petitioner offers the testimony of donor's son, her attorney and an examining physician.

George N. Thompson, M.D., by deposition testimony, stated that he examined donor on March 19, 1975, to make an evaluation of her condition, physically, neurologically and psychiatrically. It was his opinion that she did know the nature of her property, but did not know the exact size or extent of it. She was able to manage her personal affairs with

assistance and she knew the objects of her bounty. As further indicated in his report, all data was obtained from donor in order to determine her general mental competency. The data given to Dr. Thompson by donor indicates an awareness of the reason for the examination, the petition for the conservatorship, her resistance to it, her age and background, and her family (some difficulty here). Her speech was free, clear and relevant. She was not psychotic, nor was there a loss of contact with reality. Her intellectual resources were intact. She knew, generally, the operation of the family corporation and of her trusts. She did not know her address or phone number or exact year of birth. She was diagnosed as having generalized and cerebral arteriosclerosis. Conclusions were:

1. The question of her general mental competency is somewhat clouded because of memory defects. She knows the nature of her property, but not the exact size.

2. She is able to manage her business affairs only with assistance.

3. She presently possesses testamentary capacity and, with regard to general competency, she knows the general size and extent of her estate, but she does need some assistance in the management of her affairs. She would not become the victim of designing persons for she is quite astute. Her main problem is her memory.

Her son, also a psychiatrist, by deposition testimony, stated that his mother had the requisite mental capacity to execute the revocation. His reasons were given.

Ray E. McAllister, Esquire, a member of the California Bar since 1939, testified that he began to represent donor late in January, 1975. In January and March of 1975, he met with donor to discuss the trust and possible revocation. On March 21, 1975, by telephone, he was instructed to prepare a notice of revocation. Donor returned to the office March 25, 1975, to execute the revocation. The revocation was explained and discussed with donor alone and then signed and acknowledged that day. Prior thereto, the revocation and its ramifications were also explained to donor and she appeared to understand the legal consequences of signing. Also on that day, Mr.

McAllister having previously discussed the conservatorship with donor, a decision was reached to nominate Lloyd's Bank as conservator. The conservatorship was also fully explained to her. Mr. McAllister had the benefit of Dr. Thompson's report and it was Mr. McAllister's opinion that, while donor required help with her financial affairs, she was not incompetent and possessed testamentary capacity in the accepted sense. It was his own conclusion that she was competent. On the occasions he met with her, she was alert, answered questions, asked them and indicated that she understood what was being discussed. Notes of the questions and answers were made by Mr. McAllister and transcribed immediately thereafter. These notes and the testimony of Mr. McAllister indicate the meetings were detailed and exact and that Mr. McAllister exercised caution and was conscientious in making his determination as to the competency of donor. Viewed in this light, and keeping in mind that Mr. McAllister observed the speech and conduct of donor on the day of the execution of the revocation, his testimony is entitled to great weight and outweighs testimony of observations prior to and subsequent to that date. The same is true in considering the testimony of Dr. Thompson. He examined donor only days before the execution for the specific purpose of determining her mental capacity and gave the facts supporting his conclusion. Greater weight is required to be given to his testimony than to the testimony of Doctors Blumenthal and Walsh who testified without the benefit of examining donor and from hypothetical questions: *Girsh Trust,* supra, at p. 471, 478. Considering this greater weight and the limited observation of Mr. Ball and Miss McNanamy in California, and after consideration of all of the testimony, it is determined the petitioner has sustained the burden of showing that, on March 25, 1975, donor was mentally competent and understood and appreciated the effect of the revocation. The revocation will be given effect.

EXCEPTIONS DISMISSED BY PER CURIAM ORDER OF OCTOBER 22, 1979.