## Girsh Trust.

456

Argued September 28, 1962. Before BELL, C. J., MUSMANNO, JONES, EAGEN, O'BRIEN and KEIM, JJ.

reargument refused April 30, 1963.

*Laurence H. Eldredge,* for appellant.

*Thomas D. McBride,* with him *Howard Gittis, Marlin B. Stephens,* and *Wolf, Block, Schorr and Solis-Cohen,* for appellee.

*Marvin Comisky,* with him *Marlin B. Stephens, Edwin P. Rome,* and *Blank, Rudenko, Klaus & Rome,* for appellee.

*Ella Graubart,* and *Patterson, Crawford, Arensberg & Dunn,* for trustee, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 21, 1963:

This proceeding seeks to rescind an inter vivos deed of trust wherein Miriam H. Girsh (appellant) and Myers L. Girsh (Mr. Girsh), *then* husband and wife, were the settlors, appellant the principal beneficiary, and Joseph Goldstein, appellant's father, was the sole trustee; the vital, although not the sole, issue is the mental competency of appellant on June 29, 1950, the date upon which she executed the trust deed.

On December 22, 1932, appellant and Myers Girsh were married. Of this marriage one child, Marjorie Girsh, now aged 24 years, was born. The parties, then living in Merion, Pa., separated on September 17, 1947, Mr. Girsh leaving the matrimonial domicile and setting up his own separate residence.[1]

---

[1] The evidence seems to indicate that Mr. Girsh did not want a divorce and that the divorce of the parties arose from a desire on appellant's part, together with the belief on the part of both Dr. Hughes, one of appellant's doctors, and Mr. Goldstein, appellant's father, that her best interests would be thereby promoted. *Apparently,* Dr. Alpers, another of appellant's doctors, did not concur in this belief.

In 1947, appellant became mentally ill, her illness being diagnosed as "paranoid schizophrenia", and she became a patient at Jefferson Hospital, Philadelphia, under the care of Dr. B. J. Alpers, a well known and highly respected neurologist and psychiatrist. On October 14, 1947, appellant became an in-patient in the Pennsylvania Hospital Institute of the Pennsylvania Hospital (Institute) in Philadelphia where she remained, under Dr. Alpers' care, until November 19, 1947 at which time she was transferred to the 44th Street division of the Pennsylvania Hospital (44th Street division),[2] where she remained until March 5, 1948, when, apparently then mentally competent, she was permitted to "go out on visit" to her home. On August 11, 1948, appellant was readmitted to the 44th Street division where she remained until December 4, 1948 when she was transferred to the Institute until March 1, 1949 at which time she was transferred back to the 44th Street division where she remained as a patient until April 27, 1949 when she was released. Upon her release, appellant went to New York, in the company of a nurse specially trained in psychiatry, for interpretive analytical therapy with Dr. John Rosen. On August 16, 1949 she was readmitted to the 44th Street division as a patient of Dr. Joseph Hughes.[3]

With the *possible* exception of a comparatively short period of time beginning March 5, 1948 when, as a result of forty insulin shock treatments, appellant

---

[2] *At this time* 44th Street division was a "locked section" to which patients were admitted either by a commitment, involuntary or voluntary, and so-called mental patients were not supposed to be handled at the Institute. From the instant record it would appear that *at that time* 44th Street division took care of the more seriously ill patients while the less seriously ill patients were cared for at the Institute.

[3] On August 30, 1949, Dr. Hughes made a written diagnostic statement concerning appellant: "She suffers from the most serious form of mental illness known to psychiatry."

regained mental competency and returned to her home, it seems clear that, during the latter part of 1947 and throughout 1948 and 1949, appellant was mentally incompetent and a patient in mental institutions. As the court below found: "During 1949 [appellant] was a typical picture of paranoid schizophrenia. She was actively hallucinating, with auditory hallucinations, much purposeless laughing, many mannerisms, and very little insight into her illness. She had a good deal of impulsive behavior, . . ." The record fully supports the conclusion that, during this period, appellant was mentally incompetent and unable to transact any business affairs with understanding.

Appellant remained at the 44th Street division until April 23, 1950 when she was permitted to "go out on visit",[4] in the company of two nurses specially trained in psychiatry, to a hotel in New York. The court below found that the purpose of sending her to New York was "to determine whether a change in environment would result in an improvement in her mental illness. This type of treatment known as milieu therapy was at that time an advanced treatment of paranoid schizophrenia being employed by psychiatrists in private practice."

From April 23, 1950 until June 30, 1950, appellant, Mrs. Yetta Goldstein [her stepmother] and two nurses lived in a New York City Hotel. On five occasions— April 29, May 6, May 13, May 20 and May 27—Dr. Hughes visited appellant in New York and on five occasions—May 2, June 1, June 8, June 24 and June 27

---

[4] Although Dr. Hughes denies that such release from the hospital was against the advice of the hospital, the fact remains that, before appellant was released, Mrs. Joseph Goldstein—stepmother of appellant—was required to sign a release form stating, inter alia, that she removed appellant from the Pennsylvania Hospital "against the advice of its physicians, and that I assume the whole responsibility for so doing, . . . ."

—appellant, accompanied by one of her nurses, went to Philadelphia and consulted with Dr. Hughes.

It is to be noted that during the period from October 14, 1947 until June 28, 1950—approximately 32½ months—appellant was confined in mental institutions approximately 21½ months; that only one *definite* period of remission occurred, i.e., from March to August, 1948 when she was at home under the care of a nurse; that of the time thereafter when she was not in mental institutions, i.e., April to August 1949 (5 months) and from April 23, 1950 to June 28, 1950 (2 months), she was not only under the care of a psychiatrist but also experienced nurses.

On June 28, 1950, Mr. Goldstein in New York City presented two written agreements to appellant for execution, one a separation agreement and the other a trust agreement. The separation agreement was executed on June 28, 1950 by appellant and witnessed by Mr. and Mrs. Goldstein. The trust agreement, although dated June 28, 1950, was executed by appellant on June 29, 1950 and witnessed by Mr. and Mrs. Goldstein. *Only* the validity of the execution of this trust agreement is herein attacked.

Subsequent to the execution of both agreements, Mr. Girsh, on June 30, 1950, instituted an action in divorce in Court of Common Pleas No. 1 in Philadelphia County against appellant alleging indignities as the ground for divorce. A divorce was granted on September 18, 1950 and, beginning October 1, 1950, Mr. Girsh commenced making payments of $1375 monthly to appellant and said payments continued at least up until the time of the hearings in this case.

On June 30, 1950, appellant, accompanied by Mrs. Goldstein and a graduate nurse, went to Johnstown, appellant's home town and the place of abode of her father and stepmother, where she remained until November 3, 1950. During this period Mrs. Girsh re-

mained under the care of Dr. Hughes and, on at least one occasion, July 14, 1950, went to Philadelphia for an examination by Dr. Hughes.

On November 3, 1950, appellant was admitted, under Dr. Hughes' care, to Roseneath Sanitorium near Philadelphia, an institution which cared for mentally ill patients. Appellant's condition deteriorated and in January, 1951 she was readmitted, as a patient of Dr. Alpers, to the Institute where she remained continuously until May 23, 1955, a period of four and one-quarter years, at which time she was discharged. It is undisputed that since May 23, 1955 appellant has been mentally competent and has made a remarkable recovery.

Under the trust agreement, Mr. Joseph Goldstein was named as the sole trustee but, prior to his death in August, 1950, under the authority vested in him by the trust agreement, Mr. Goldstein selected Morton Meyers, Esq. of Johnstown as his successor-trustee and Mr. Meyers now serves in that capacity. Mr. Meyers, as trustee, has filed three accounts in the Orphans' Court of Cambria County; the first account was filed in 1954, the second account in 1957, and the third account on June 28, 1960. At the audit of the third account, appellant filed this petition to rescind the trust and to have the balance in the hands of the trustee awarded to her on the ground that she was mentally incompetent at the time she signed the trust agreement on June 29, 1950. To this petition separate answers were filed by Morton Meyers, trustee, Mr. Girsh, and Marjorie Girsh, the latter as a remainder-man under the trust and appellant filed separate replies to new matter pleaded by Mr. Girsh and Marjorie Girsh.

After hearings which consumed the better part of six days, the Orphans' Court of Cambria County concluded: (1) that, on June 28, and on June 29, 1950,

when appellant executed, respectively, the separation and trust agreements, she was mentally competent; (2) that, by her conduct since 1955, appellant has ratified both the separation and trust agreements; (3) that appellant is guilty of laches; (4) that both the separation and trust agreements are valid; (5) that the petition to rescind the trust must be dismissed. Appellant filed exceptions to certain of the court's findings of fact and conclusions of law and to the failure of the court to rule on the admissibility of certain notes of Dr. Hughes. After argument, the court held that Dr. Hughes' notes were admissible, sustained two of the exceptions as to two findings of fact but, in every other respect, affirmed the prior adjudication. From such decree this appeal was taken.

On this appeal five questions are raised: (1) did the court err in finding that appellant was mentally competent on June 29, 1950?; (2) in view of the court's finding that appellant was incompetent before and after June 29, 1950, did the court err in ruling that the burden of proof remained on appellant to establish by strong, clear and compelling evidence that she was incompetent on June 29, 1950?; (3) under Pa. R.C.P. 1519 (b), did the court err in dismissing exceptions to the non-disposition of requests for specific basic findings how appellant acted and what she said and did on, prior to and after June 29, 1950, based on contemporaneous doctors' and nurses' notes?; (4) was appellant guilty of laches?; (5) did appellant ratify the trust agreement?

Before considering these questions we must examine the pertinent provisions of both the separation and trust agreements. The separation agreement [after reciting that appellant and Mr. Girsh are husband and wife and the parents of one child Marjorie Girsh, and that appellant has been represented in the negotiations by her father, Joseph Goldstein, who had the

advice of *his counsel,* Morton Meyers, to whom Mr. Girsh had made a full disclosure of his assets and liabilities,[5] and, after reciting the terms of the trust which was to be created simultaneously with the separation agreement] provided: in the event the parties become divorced, Mr. Girsh, beginning on the first day of the month after the grant of the divorce and on the first day of each month thereafter for a period of 144 months [12 years] would pay to appellant $1375 each month, provided that such payments would not continue after appellant's death and, further, if Mr. Girsh died before all such payments had been made, such payments would continue to be an obligation of his estate; that such payments would be in full satisfaction and discharge of Mr. Girsh's obligation to appellant for support and maintenance and, to that end, released Mr. Girsh from all claims for support and maintenance; that each party released any and all claims against each other's estate; that the purpose of this agreement was "to make provision for [appellant] only and not for [the child], except with respect to [the child's] contingent interest in the trust fund" and that Mr. Girsh would continue to recognize his obligations to Marjorie Girsh as her father; that the "amount of the *res ha*s been determined by the expected needs of [appellant]" and that it was "the intent of the parties that the entire trust *res* shall be available if necessary for her sole benefit."

The trust agreement provided that appellant and Mr. Girsh, as settlors, would deliver to Joseph Goldstein, as sole trustee, cash in the amount of $500,000 and a note of Mr. Girsh in the amount of $250,000 making a total trust *res* in the amount of $750,000;

---

[5] The court found that Messrs. Goldstein and Meyers in April, 1950 obtained from Mr. Girsh a statement of his assets which showed a book value in excess of seven million ($7,000,000) dollars.

that it was the purpose of the trust, in supplement to the separation agreement, to provide for the payment of appellant's ordinary and usual living expenses, medical, hospital, nursing and related expenses, regardless of her marital status, plus any taxes payable by appellant by virtue of the receipt of such funds; that payment to or for appellant to meet these expenses were to be made "from the following sources, in the order named"; (a) trust income, (b) payments under the separation agreement and (c) principal of the trust, provided payments for "ordinary and usual expenses", exclusive of appellant's tax liabilities, were not to exceed $20,000 annually; if appellant's actual expenses, because of medical, hospital, nursing or related bills, should exceed in any year $20,000, then the trustee, in the exercise of a liberal discretion, might pay such expenses from the sources mentioned and in the order named; the agreement included a spendthrift clause; in the alternative, appellant was given a general power of appointment by her will over not more than ten (10%) per cent of the principal of the trust at the time of her death or a special power of appointment among any surviving child or children of appellant over not more than one-third (33 1/3%) per cent of the principal of the trust at the time of her death, it being understood that, if appellant died prior to the maturity of Mr. Girsh's note, the note was not to be considered part of the principal of the trust; subject to these powers of appointment, any assets remaining in the trust at the time of appellant's death were to be paid over to the trustee of an irrevocable trust being created by Mr. Girsh for Marjorie Girsh and her issue; that, immediately upon the execution of the trust agreement, the trustee, with cash from the trust res, should establish in his name a separate deposit and checking account in the amount of $50,000 to enable the trustee to purchase a suitable home for appellant and to pay

promptly all her bills, said account to be maintained at approximately $15,000 upon the purchase of the home or the expiration of two years from the date of the agreement, whichever should occur first; the trustee was directed to invest the trust res, except as to the amount maintained in the bank account, "in high grade securities the income of which is exempt from federal income taxation, or in bonds issued or unconditionally guaranteed both as to principal and income by the United States Government". *To the trust res appellant contributed assets having a then value of $376,787.05 and Mr. Girsh contributed $123,212.95 together with a note for $250,000.*[6]

The thrust of appellant's action is that she is entitled (a) to a repayment of the sum of $376,787.05 (the amount of the proceeds of the sale of her property which went into the trust) and (b) the sum of $373,-212.96 (the balance shown in the trustee's third account over and above the amount paid into the trust by appellant) which represents Mr. Girsh's contribution to the trust in consideration of which he received the relinquishment of all appellant's rights in his then seven million dollar estate and other benefits under the separation agreement.

On the evidence of record, did the court err in finding that appellant on June 29, 1950 was mentally competent to execute this trust agreement?

In resolving this question, certain well settled principles of law act as guideposts: *first,* "[w]here an auditing judge or chancellor who sees and hears the witnesses finds facts which have competent and adequate evidence to support them and these findings are approved by the court en banc, they will not be reversed on appeal. [citing cases]": *Snyder Estate,* 368 Pa. 393, 397, 84 A. 2d 318; *Pavlinko Estate,* 399 Pa.

---

[6] Mr. Girsh paid this note in accordance with its terms.

536, 160 A. 2d 554; *Faller Estate,* 407 Pa. 73, 180 A. 2d
33; *second,* however, if the facts are undisputed, the re-
viewing court can draw the appropriate inferences and
conclusions from the evidence regardless of the action
of the court below *(Jury Estate,* 381 Pa. 169, 112 A. 2d
634) and deductions or inferences made by the court
below may be set aside if they lack evidential support
*(Blue Ridge Metal M. Co. v. N. Pa. P. Co.,* 327 Pa. 424,
194 A. 559; *Kalyvas v. Kalyvas,* 371 Pa. 371, 89 A. 2d
819; *Carnock v. Filer,* 392 Pa. 468, 472, 141 A. 2d 195;
*Chambers v. Chambers,* 406 Pa. 50, 176 A. 2d 673;
*third,* the findings of fact of a chancellor, even though
approved by a court en banc, need not be accepted as
conclusive where the evidence, in order to prevail, must
be clear, precise or compelling or must meet some other
prescribed standard: *Commonwealth Trust Co. v.
Szabo,* 391 Pa. 272, 277, 138 A. 2d 85; *Sechler v.
Sechler,* 403 Pa. 1, 5, 169 A. 2d 78; *fourth,* the mental
competency of a person is a fact but the existence of
that fact must be determined by inferences or deduc-
tions from other facts such as the spoken words, the
acts and the conduct of the person and thus the finding
of mental capacity is reviewable on appeal.

In proof of her mental incompetency on June 28
and June 29, 1950, appellant presented her own testi-
mony and that of Dr. B. J. Alpers, together with con-
temporaneous notes made by several nurses and by Dr.
Joseph Hughes (who attended her during the period
prior to, at and for a while subsequent to the crucial
dates of June 28 and June 29, 1950) and contempora-
neous letters of Dr. Hughes. The appellees—Mr. Girsh,
Marjorie Girsh and Morton Meyers, the trustee—pro-
duced the testimony of Dr. Hughes, Dr. Matthew
Moore,[7] Dr. Philip Roche,[7] Mrs. Yetta Goldstein, Mor-

---

[7] Drs. Roche and Moore up until the date of the hearings had
never seen appellant, had not attended her in any manner and had
no knowledge of her background except that which they gleaned

ton Meyers, Miss Mary Warwick and Miss Annie Hunt, the latter two being appellant's nurses in June, 1950.

Appellant's initial contention is three fold: (a) on the posture of this record, the *ultimate* burden of proving that, on June 29, 1950, appellant possessed sufficient mental competency to execute this trust agreement rested on appellees; (b) that to sustain this burden required proof of mental competency not by a *preponderance* of, but by *clear* and *convincing*, evidence; (c) that appellees have not met this burden.

First, as to the burden of proof. *Ordinarily,* the mental competency of a person who executes an instrument is presumed and the burden of proof is upon the person who alleges incompetency: *Lasky v. Paprocki,* 363 Pa. 50, 52, 68 A. 2d 593; *Patterson v. Snider,* 305 Pa. 272, 276, 157 A. 612; *First National Bank of Easton v. Wirebach's,* 106 Pa. 37, 46; *McClaney v. Scott,* 188 Pa. Superior Ct. 328, 335, 146 A. 2d 653; *Feely Estate,* 173 Pa. Superior Ct. 441, 450, 98 A. 2d 738; *Youngwood Bldg. & Loan Association v. Henry,* 137 Pa. Superior Ct. 124, 126, 8 A. 2d 427.[8]

---

from sitting in court listening to the witnesses and examining the various notes of the nurses, Dr. Hughes, etc. In *Mascianionio Will,* 392 Pa. 362, 384, 141 A. 2d 362, commenting on the situation where a medical witness who has neither seen or examined the person whose mental capacity is in question ventures an opinion as to such mental capacity based upon a hypothetical question or questions, we said: "Such opinions are quite properly afforded little weight: Conway Will, 366 Pa. 641, 643, 644, supra; DeMaio Will, 363 Pa. 558, 563, supra; Guarantee Trust and Safe Deposit Co. v. Waller, 240 Pa. 575, 584, supra." It is to be noted that, neither in its adjudication nor in its opinion dismissing the exceptions, did the court below mention either Drs. Moore or Roche or their testimony.

[8] Had there been an *adjudication* of appellant's mental incompetency, the rule would be otherwise: *Mohler's Estate,* 343 Pa. 299, 305, 22 A. 680; *Brennan's Estate,* 312 Pa. 335, 339, 340, 168 A. 25; *Hoopes' Estate,* 174 Pa. 373, 375, 34 A. 603; *Leckey v. Cunningham,* 56 Pa. 370, 373.

Therefore, in the case at bar, the *initial* burden of proof of incompetency was upon appellant. In assumption of that burden, the appellant proved that, prior to June 28 and June 29, 1950, she had been confined in mental institutions for approximately 21 1/2 months out of 32 1/2 months and that as late as June 10 and June 11, 1950, although there was reason to hope for a remission in her condition, appellant's condition was "such that she could not enter into any legal contract or relationship",[9] and that, *subsequent* to June 28 and June 29, 1950, (beginning *at the latest* in November, 1950) appellant was hospitalized in one or another mental institution for the next four and one-quarter years.[10] The record is clear that appellant was suffering from "schizophrenia, paranoid" which has been defined as a "disintegration of the individual's mind and personality, characterized by disturbances of thinking, . . . hallucinations and similar manifestations.": Am. Jur., Proof of Facts, Medical Glossary, p. 215. Under such circumstances, did the burden of proof shift to the appellees to prove the mental competency of appellant? [11] In *First National Bank of Easton v. Wirebach's,* supra, p. 46, it was said: "if however general or habitual unsoundness of mind be once established, the burden of proving a lucid interval or a restoration, at any particular time, is thrust upon those who allege the fact." In *Landis v. Landis,* 1 Grant 248, (a will case),[12] the Court said: "When once such mental incapacity is established, and the minds of the jury are convinced of that fact, and a general derangement

9 See Finding of Fact No. 31.

10 See Finding of Fact No. 69.

11 "It is not at all unusual in the trial of cases for the so-called 'burden of proof' (or, more properly, the burden of coming forward with opposing evidence) to shift to defendant": *Henes v. McGovern,* 317 Pa. 302, 309, 176 A. 503.

12 The rule in cases involving wills and cases involving deeds or contracts is the same in this respect.

or imbecility of mind clearly proved, at any time prior to the time when the . . . will was executed, then the burden of proof is changed, and those who attempt to establish the validity of the paper, must prove that the alleged testator, at the time of the execution of the instrument, had sufficient mental capacity to execute a will. . . ." In *Harden v. Hays,* 9 Pa. 151, 162, it was said: ". . . but when a general imbecility of mind is proved, the burthen of proof is thrown upon the opposite party, who must show that it was executed in a lucid interval, and when the testator had understanding and capacity sufficient to execute the will." See also: *Hall Will,* 402 Pa. 212, 220, 222, 166 A. 2d 644; *Gingrich v. Rogers,* 69 Neb. 527, 96 N.W. 156, 157.

On the state of the instant record, it is clear beyond question that, *very shortly* before the date upon which this trust agreement was executed, appellant suffered from the "most serious form of mental illness known to psychiatry", an illness which had existed for upwards of two years; that, prior to, at the time of, and subsequent to the time of execution of the trust agreement, appellant was under the care of psychiatric nursing; that, for a period of over four years thereafter, appellant was continuously a patient in mental institutions. In its adjudication the court below stated: "There is no doubt that[appellant] was incompetent before this period and relapsed into incompetency some time later". The record not only fully supports this statement but indicates that the time interval between the date of execution of the trust agreement and the previous and succeeding incompetency was short in duration. Under such circumstances, appellant's previous and subsequent mental incompetency was of such *recent* and *serious* nature and *apparent* permanence as to impose upon appellees the burden of proving that, on the date the trust agreement was executed, appellant possessed mental competency.

In its adjudication the court below, despite its findings, placed upon appellant the burden of proof; in this respect, the court erred. However, in its opinion sur exceptions to the adjudication, the court properly held that the burden of going forward with evidence was upon appellees.

*Under the instant circumstances,* it being definitely appellees' burden to prove that, on the date of execution of the trust agreement, appellant possessed mental competency, i.e. the ability to understand and appreciate the nature and effect of the trust agreement, to sustain such burden required the production not of a preponderance of evidence but of proof *clear* and *convincing* in nature. In *Petro v. Secary Estate,* 403 Pa. 540, 170 A. 2d 325, this Court enunciated very clearly what is meant by evidence *clear* and *convincing* in nature.

Was the court below correct in finding that appellees' evidence was *clear* and *convincing?* In passing upon this question, certain legal principles must guide us: (a) "It is not for this Court, by studying isolated, cold words of a printed record, to believe certain witnesses and to disbelieve others. *The matter of credibility is for the trial court.* The discretion possessed by that court . . . is particularly broad because his is the best opportunity to observe the demeanor of the witness called before him": (emphasis supplied) *Mamallis v. Milbourne Borough,* 401 Pa. 375, 380, 164 A. 2d 209; *Manstein v. Manstein,* 369 Pa. 252, 257, 85 A. 2d 150; *Archer Estate,* 363 Pa. 534, 535, 536, 70 A. 2d 857; (b) "opinion evidence is generally considered of a low grade, and not entitled to much weight against positive testimony of actual facts":[13] *Ray v. Phila.,* 344 Pa.

---

[13] Particularly applicable is this rule where a medical witness who has neither seen or examined the person whose capacity is in question, such as Drs. Roche and Moore in the case at bar, is asked a hypothetical question, often based on facts in dispute, and gives

439, 441, 25 A. 2d 145; *Kadilak Will*, 405 Pa. 238, 243, 174 A. 2d 870; *Sommerville Will*, 406 Pa. 207, 213, 177 A. 2d 496; (c) however, even opinion evidence loses much of its weakness when it is supported by factual testimony: *Masciantonio Will*, 392 Pa. 362, 383, 141 A. 2d 362; *Henry's Estate*, 276 Pa. 511, 513, 120 A. 454; (d) "where mental capacity is at issue, the real question is the condition . . . at the very time he executed the [instrument], although evidence of capacity or incapacity for a reasonable time before and after the making of the [instrument] is admissible as indicative of capacity or the lack of it on the particular day: [citing cases].": *Williams v. McCarroll*, 374 Pa. 281, 293, 97 A. 2d 14.

The critical or crucial times at which appellant's mental competency must be determined are June 28, 1950—when the separation agreement was executed— and June 29, 1950—when the trust agreement was executed. Actually, while *both* dates are important, June 29 is the *more* important since it is only the validity of the trust agreement that is challenged.

To that which transpired on June 28 and June 29 the sole witnesses were Mrs. Goldstein, who witnessed both agreements, and Misses Warwick and Hunt, the nurses. All three witnesses testified to the events which transpired on both dates;[14] Mr. Goldstein's arrival at the hotel apartment with the agreements, the discussion, sometimes in loud tones, between appellant and Mr. Goldstein of the contents of the agreements,

_____

his opinion of an equally hypothetical individual who displays the symptoms stated in the question.

[14] Since Miss Hunt did not report for duty on June 28 until noon her account covers those events which transpired from that time until noon on June 29. Miss Warwick stayed in appellant's apartment until 2:30 p.m., June 28, and her account covers those events which transpired from 9:00 a.m.—2:30 p.m., June 28, and from noon, June 29, until noon, June 30.

the reading at length of the agreements by appellant, the execution of the separation agreement, the deletion by appellant from the trust agreement of references therein to a certain law firm and her refusal to execute the trust agreement until such references were deleted in a redrafted agreement, the execution on June 29 of the trust agreement redrafted to suit appellant's wishes, appellant's actions on both dates subsequent to Mr. Goldstein's departure, etc.

We have said that a person's "mental capacity is best determined by his spoken words, his acts and conduct:" *Myers Estate*, 395 Pa. 459, 467, 150 A. 2d 525. These witnesses did outline and describe the words, acts and conduct of the appellant and, from their observation of such words, acts and conduct, they all concluded that the appellant *on those dates* did possess sufficient mental capacity to understand and appreciate the meaning and nature of the agreements which she executed. This conclusion, in a sense, was an *opinion* but "an opinion arrived at after an observation of facts, i.e. their sensory impression of [appellant's] words and actions", and "Their testimony was neither entirely factual nor entirely opinion but mixed opinion and factual.": *Masciantonio Will*, supra, 379, 380. See also: II Wigmore on Evidence, (3rd Ed.), §§657, 658, 659; *Patterson v. Snider*, supra. These three witnesses were not only the best but the sole living witnesses of how appellant spoke and how she acted on the critical days when these agreements were executed.

Appellees produced the testimony of Dr. Joseph Hughes who not only has an impressive record as a psychiatrist but also acted as appellant's attending psychiatrist and physician for 10 1/2 months immediately prior to the execution of these agreements and for approximately 7 months subsequent to such execution. During this period of time, whether appellant was in or out of a mental institution, Dr. Hughes saw, talked

with and observed her with great regularity. According to Dr. Hughes, the appellant, suffering from paranoid schizophrenia, showed little or no improvement until the beginning of June, 1950 at which time he noted some slight improvement in her condition, but that during the latter part of June, 1950 and July, 1950, appellant entered a period of remission to the extent that she had regained full mental competency to execute these agreements. On June 24, 1950—five days prior to execution of the trust agreement—he saw appellant in a *regularly* scheduled examination and on June 27, 1950—two days prior to execution of the trust agreement—he saw appellant in an examination *specially* scheduled, at the request of appellant's father, to specifically determine appellant's mental capacity to execute both the separation and trust agreements. As a result of his observation of the appellant on the occasions of both these examinations, Dr. Hughes certified, in a telephone call, that the appellant had the mental competency to execute these agreements. On July 14, 1950, Dr. Hughes again examined appellant in the course of a regular examination and thereafter, in writing, gave his opinion that, both on the dates when the agreements were executed as well as on July 14, 1950, appellant was mentally competent.

Appellees also called Morton Meyers, Esq., conceded by appellant to be a highly ethical and respected member of the bar. Mr. Meyers, who represented appellant's father in the early part of 1950 in negotiating with Mr. Girsh's counsel the separation and property settlement documents, on April 11, 1950 visited appellant in the Institute, found her unable to discuss business matters and urged her father to have a guardian appointed for her which the father hesitated to do. On June 3, 1950 Mr. Meyers visited appellant in her hotel apartment in New York and found her very confused, hallucinating and engaged in bizarre behavior. How-

ever, on June 25, 1950, at the request of appellant's father, Mr. Meyers again visited appellant in New York. On the occasion of that visit, Mr. Meyers found appellant "indeed improved", "pleasant" and she "talked intelligently" to him; he discussed with her the pending agreements and property settlement. While he would not express any "pyschiatric opinion" as to her competency, he did testify: "She talked to me. She knew me. She appeared to understand what I was telling her." Mr. Meyers, who at that time was again negotiating with Mr. Girsh's counsel the property settlement and separation agreements, insisted that, before any of the agreements be executed, Dr. Hughes give his opinion as to appellant's mental competency.

To offset this testimony of appellees, the appellant offered her own testimony to the effect that she had no recollection of signing either agreement, the testimony of Dr. Bernard Alpers who demonstrated the incompetency of appellant during 1951-1954, the finding of Judge Nelson of Cambria County on October 22, 1954 that appellant was so incompetent as to necessitate the appointment of a guardian ad litem for her in connection with her father's estate, the nurses' daily notes and the notes of Dr. Hughes and, particularly, Dr. Hughes' letters of June 6, June 27 and June 30, 1950.[15]

---

[15] On June 6, 1950, Dr. Hughes wrote Dr. S. B. Meyers of Johnstown, Pa.: "The continuation of her hallucinatory state at the present time renders any legal action on this matter [divorce] impossible to the degree that it would require the patient's compliance, understanding and agreement" although he did state "I believe that the patient will have a remission in her symptoms." On June 27 (letter dictated June 26) Dr. Hughes wrote Mrs. Goldstein stressing the need of adequate nursing required for appellant "to get well" and stating that "we are in a critical phase of [appellant's] illness." On June 30, Dr. Hughes again wrote Dr. Meyers asking him to be in attendance and on call for any of appellant's needs in Johnstown and stating that he intended to treat appellant "with diencephalic electroshock in September."

Appellant's own testimony was purely negative; while her signature to these agreements was admitted, she was without *any* recollection of signing them. Dr. Alpers' testimony confirmed the incompetency of appellant within several months after execution of the agreements as well as her incompetency while under his care several years prior to the execution of the agreements, which facts were properly found by the court below. The finding by Judge NELSON on October 22, 1954 also confirms her incompetency three years subsequent to June 29 but such finding of incompetency could not be retrospective: *Gorgas v. Saxman,* 216 Pa. 237, 239, 65 A. 619; *Myers Estate,* supra, 469.

An examination of the notes of Dr. Hughes and the nurses, together with Dr. Hughes' letters, does indicate a conflict in some respects with the nurses' and Dr. Hughes' oral testimony. However, such conflict goes to the question of *credibility,* a question solely for resolution by the chancellor who, after observing and hearing the nurses and Dr. Hughes, resolved the question of credibility in their favor. We cannot substitute our own judgment for that of the chancellor on the question of credibility; his opportunity to resolve *that question* was much greater than ours. The fact is that, in the case at bar, Judge NELSON, despite the notes and letters, *believed* the oral testimony of the nurses and Dr. Hughes. With that belief we cannot interfere.

In the area of the law dealing with mental competency, in general, at least three classes of testimony are encountered: (1) the testimony of those who observed the speech and conduct of the person *on the day of execution of the instrument* whose validity is challenged; (2) the testimony of those who observed the speech and conduct of the person *a reasonable time before and after the day of execution of the instrument;* (3) the testimony of those who *never* observed the speech and conduct of the person. In the first two classes, every

witness, whether lay or expert, recites what he or she *observed* and then draws from the *observation* of such behavior an *inference* as to competency or incompetency which is called an opinion. In the last class, the inference is drawn after *reading* or *hearing* someone's recital of the person's speech and conduct, reliance being placed not on the observations of the witness but on the observations of another party. Obviously, the last class of testimony is not entitled to much weight. Because of the importance of establishing mental competency as of a particular date the testimony of those who observed the speech and conduct of the person *on that date* outranks testimony as to observations made prior to and subsequent to that date, although the latter testimony is admissible and entitled to weight.

A review of this record clearly indicates, as found by the court below, that shortly *before* and *after* June 29 appellant was mentally incompetent. Our task is to ascertain from this record whether the evidence clearly demonstrates that in the *interim* period appellant was in such a state of remission[16] and was experiencing such a lucid interval[17] that she was then mentally competent. In this connection it must be noted that there is no evidence of record that the type of mental illness which afflicted appellant precluded the occurrence of states of remission and lucid intervals; in fact, the record indicates that prior to June 29 appellant had one definite period of remission.

Those witnesses, who were in close association with the appellant on June 29 and were best able to observe

---

[16] A remission is "a diminution or abatement of the symptoms of a disease; also the period during which such diminution occurs": Dorland, American Illustrated Medical Dictionary, (22nd Ed.), 1289.

[17] A lucid interval is "a full return of the mind to a state where a party is in possession of the powers of his mind enabling him to understand and transact his affairs as usual": *Elkin's Heirs v. McCracken*, 11 Phila, 534, 539 (AGNEW, P. J.).

her speech and actions on that date,—Mrs. Goldstein and the two nurses—all testified that on that date appellant was mentally competent. While Dr. Hughes did not see appellant on that date, nevertheless he had talked with and had observed appellant on June 24 and June 27; his observations were those of a *trained* observer, one whose experience with appellant's behavior extended over a ten month period and whose objective in his observations on June 27 was to ascertain and determine whether appellant possessed sufficient mental competency to execute, with understanding and appreciation, the separation and trust agreements. Viewed in this light, the testimony of Dr. Hughes bears considerable weight. Moreover, the testimony of Attorney Meyers is most significant. One cannot help concluding, after reading Attorney Meyer's testimony, that he was most conscientious in his protection of appellant's rights. On April 11 and June 3, appellant's behavior in his presence was that of an incompetent person and his testimony so reveals; however, his testimony as to her behavior on June 25 clearly indicates that appellant was then in a state of remission.

In appellant's attack upon the oral testimony of Mrs. Goldstein, the nurses and Dr. Hughes, reliance to a great extent is placed upon the notes of the nurses and Dr. Hughes and the latter's letters as such notes and letters reflect appellant's condition at or about June 29. Appellant urges that the contents of such notes and letters not only contradict the oral testimony of Mrs. Goldstein, Dr. Hughes and the nurses but also furnish the more reliable evidence of appellant's true condition since the notes and letters were made contemporaneously with the events whereas the oral testimony was based on eleven year old recollections. As we view this attack it is basically an attack upon the credibility of the witnesses. The court below read, examined and considered the contents of the notes and

the letters and it also saw and heard the witnesses; it then resolved the question of credibility in favor of the oral testimony of these witnesses and that resolution of credibility binds us. Moreover, the failure of Mr. Girsh to testify in corroboration of certain events (i.e. telephone conversation with appellant on June 28), the bizarre behavior of appellant recorded in the nurses' notes, the "confusion" in appellant's mind concerning the exact terms of the agreements after execution thereof as recorded in the nurses' notes, etc., were all fairly presented to and considered by the court below and that court nevertheless concluded that, on the basis of the oral testimony, appellant was mentally competent on June 29.

If Mrs. Goldstein, the nurses, Dr. Hughes and Attorney Meyers are to be believed, on June 29 appellant was in a state where her mental illness had abated and she was then in possession of sufficient mental capacity to execute the trust agreement. Assuming, as we must, the credibility of their testimony, such testimony bears the qualities of proof requisite in this area of the law and appellees have sustained their burden of showing that on June 29 appellant was mentally competent.

While in no sense controlling or in any manner determinative of the present issue, it is significant: (a) the principal actor in securing the negotiation and execution of both the separation and execution of the separation and trust agreements was Joseph Goldstein whom the record reveals to have been the person nearest and dearest to appellant and most protective of her best interest; (b) neither fraud nor bad faith nor overreaching is charged or proved; (c) the adequacy of the *res* of the trust is not questioned and that which appellant seeks is a rescission of the trust agreement so that the *res* of the trust might be placed under her control and supervision free and clear of the trust provisions and of any restriction upon the allienation

thereof; (d) the validity of the execution of the separation agreement—on June 28—is not challenged.

In view of our conclusion that appellant did have sufficient mental capacity to execute this trust agreement, we need not consider other questions raised, i.e. whether appellant was guilty of laches or whether appellant had by her acts and conduct ratified the trust agreement.

Decree affirmed. Each party to pay own costs.