## In re Bridget T. Hasson

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

*George Bannon* and *Alan J. Candell*, for accountant

*Michael F. Cotter*, for Rita H. Greene and Bridget Hasson.

HERRON, *J.*, October 28, 2013—On August 9, 2010, Bridget Hasson executed a power of attorney appointing her niece, Mary Bransfield, as her agent. Bridget, who is 85, had been employed as a nurse in Philadelphia for more than thirty years and owned a home at 1605 Frankford Avenue. In late 2011, she returned to Northern Ireland where she presently resides. On November 26, 2012, Rita Greene, on behalf of Bridget Hasson, filed a petition seeking an accounting by Mary Bransfield of her actions as the agent of Bridget Hasson.[1] Ms. Bransfield filed an account on January 30, 2013 covering the period August 2010 through December 31, 2012. In response, Rita Greene filed objections to the account as well as a petition to remove Mary Bransfield as agent for Bridget Hasson.[2]

---

1. Ms. Greene sought to introduce into evidence 2 letters from Bridget Hasson: one to George Bannon (Ex-P-3) and one to Mary Bransfield (P-4). Ex. P-4 was not admitted on the grounds of an inability to cross examine. The admissibility of the letter to Mr. Bannon was held under advisement until counsel deposed him, but since that deposition never took place, Ex. P-4 is likewise inadmissible. *See* 4/9/13 N.T. at 53-54.

2. The 11/26/12 Petition seeking an accounting was filed by Rita Greene, pro se, on behalf of Bridget Hasson. The 2/28/13 petition to remove Mary Bransfield as well as the objections to the account Bransfield filed were filed by attorney Michael Cotter on behalf of Rita Greene. On July 18, 2013—after the hearing and briefing schedule was closed—Mr. Cotter entered his appearance "on behalf of petitioner,

In that petition, Rita Greene stated that on January 23, 2013, she had been appointed by Bridget Hasson as her agent under a durable power of attorney. Ms. Bransfield objected to the petition to remove her as agent, asserting, inter alia, that Ms. Greene has conflicts of interest that are adverse to Bridget Hasson.

A hearing was held on the objections to the account as well as the petition to remove Mary Bransfield as agent. Following that hearing, briefs were filed that identified the issue before this court as whether Bridget Hasson was legally competent in January 2013 to appoint Rita Greene as her agent to assist with the management of her financial affairs.[3]

## Legal Analysis

Under Pennsylvania law, the "mental competency of a person who executes an instrument is presumed and the burden of proof is upon the person who alleges incompetency." *In re Meyers*, 410 Pa. 455, 468, 189 A.2d 852, 858 (1963). These general principles have been applied in cases where the validity of a power of attorney is challenged:

> Written instruments are not to be set aside except upon convincing testimony that their execution was tainted with fraud, either actual or constructive, or that the person so executing them did not have what the law considers sufficient mental capacity to do so...Contracts made with an incompetent before his adjudication as weak-minded are voidable and can be avoided only on

---

Bridget T. Hasson, who recognizes and approves of my continuing to represent her agent, Rita H. Greene, in this matter."

3. 6/18/13 Rita Green Brief at 1; 7/12/13 Mary Bransfield Brief.

proper showing that he was incompetent at the time.... When mental competency is at issue the real question is the condition of the person at the very time... he executed the instrument.... Competence is best determined by a person's words or acts. The testimony of persons who observed the alleged incompetent on the date in question is generally superior to testimony as to observations made prior to and subsequent to that date. Ordinarily competence is presumed, and the burden of proof is on the person who alleges the incompetence....

*Kovalenko Estate*, Fid.Rep. 2d 403, 407-08 (Carbon Cty. O.C. 2000), *quoting Weir by Gasper v. Estate of Ciao*, 521 Pa. 491, 502-03, 556 A.2d 819, 824 (1989) (citations omitted).

In general, courts encounter three classes of testimony as to competency: "(1) the testimony of those who observed the speech and conduct of the person *on the day of execution of the instrument* whose validity is challenged; (2) the testimony of those who observed the speech and conduct of the person *a reasonable time before and after the day of execution of the instrument*; (3) the testimony of those who never observed the speech and conduct of the person.." *In re Meyers*, 410 Pa. 455, 476, 189 A.2d 852, 862 (1963). The last class of testimony is given the least weight. *Id.*

The nature of the "competency" required for the execution of a valid document, moreover, can vary depending on the type of document at issue. In the case of releases, for instance, a court seeks to determine whether a person had an intelligent understanding of the release by focusing on such factors as (1) the mental and physical

condition of the signer; (2) the circumstances in which the release was obtained; (3) the amount paid for the release; and (4) the span of time between the accident and the signing of the release." *Taylor v. Avi*, 272 Pa. Super. 291, 297, 415 A.2d 894, 897 (1979). In the case of trusts, in contrast, the requisite mental capacity to execute a trust has been defined as whether a person had an "ability to understand the nature and effect of the trust agreement." *In re Meyers*, 410 Pa. at 471, 189 A.2d at 859. The mental capacity for executing a power of attorney has recently been refined by a tripartite analysis in *In re Robinson, Incapacitated Person*, 28 Fid. Rep. 2d 65 (Mont. Cty. O.C. 2008). In that case, Judge Stanley Ott concluded that at a minimum it was necessary to show that the principal who executed a power of attorney understood the following: (1) the authority he was giving to the agent; (2) the assets that would be subject to that authority, and (3) the plain language of the notice. *Id.* at 82. Where the mental capacity of someone who has executed a durable power of attorney is challenged, courts require that the lack of capacity be shown by clear and convincing evidence. *In re McKinney*, 27 Fid. Rep. 2d 359, 360 (Chester Cty. O.C. 2007).

Resolution of this threshold issue of whether Bridget Hasson was legally competent to appoint Rita Greene as her agent is severely handicapped in this case by the failure of Bridget Hasson herself to appear at the hearing. The task is further complicated by her residence since late 2011 in Northern Ireland. Since the account filed by Mary Bransfield states that Ms. Hasson has assets in excess of $600,000 in the United States, control over those assets raises serious concerns.

Instead of direct testimony by the principal, testimony

was presented by the two putative agents—Rita Greene and Mary Bransfield—as well as by Bridget's niece Margaret Thompson. In addition, the parties stipulated to the admissibility of two reports by Dr. T. Flynn, a "consultant psychiatrist specializing in disorders of old age."[4] In the report dated February 8, 2012, Dr. Flynn diagnosed Ms. Hanson as having "significant anterograde short term memory deficits in the setting of a good social facade" which "is consistent with early Alzheimer dementia." In more general terms, he noted "I felt at her initial appointment she was incapable of managing her finances correctly but she would be capable of instructing someone to act on her behalf as Enduring Power of Attorney." Ex. P-6. In the report dated June 15, 2012, in contrast, Dr. Flynn likewise diagnosed Bridget with early Alzheimer dementia but concluded:

> She has insight into her memory problems but has inadequate knowledge of her finances to make coherent decisions about them. She would be vulnerable to financial abuse...She lacks capacity to make decisions regarding her finances and her affairs, both in Ireland and in the U.S. These would need to be safeguarded. She is aware that her memory is poor and that her finances would need to be legally supervised.

Ex. P-7.

---

4. Ex. P. 7; *See also* Ex. P-6. The reports are dated June 15, 2012 and February 8, 2012 but there is some confusion as to which was the first report. Counsel for Mary Bransfield, for instance, stated that the February 8, 2012 report was actually "supposed to be after the first report." 4/9/13 N.T. at 8 (Candell). In fact, there is a handwritten notation on Ex. P-6 of "13" after the date 02/08/2012. During the hearing, counsel for both parties agreed this report was actually done in February 28, 2013. *See* 4/9/13 N.T. at 41 (Cotter and Candell).

Dr. Flynn's observation in his June 15, 2012 report that Bridget "lacks capacity to make decisions regarding her finances and her affairs" and that she would be "vulnerable to abuse" were based on his conversations with her and constitute factual observations. His suggestion in the February report that she "would be capable of instructing someone to act on her behalf as Enduring Power of Attorney," in contrast, strays into the realm of legal conclusion.

There is no dispute that in 2010 when Bridget asked Mary Bransfield to serve as her agent Bridget was aware that she had memory problems and an increasing inability to handle her financial affairs. In her brief, Rita Greene concedes that in "2010 Bridget Hasson began suffering from short-term memory deficits and retained Attorney George Bannon to prepare a Power of Attorney naming her niece, Mary Bransfield as her agent in order to assist her in paying bills and maintaining her home on Frankford Avenue."[5] In her testimony, Mary Bransfield fleshed out these points based on personal observations of her Aunt Bridget over the course of forty years after Mary first came to the United States in 1972. In 2010, Ms. Bransfield observed, Bridget "was aware that her memory was failing her. And she had asked me if I would be willing to be Power of Attorney because she was getting confused and she needed somebody to keep an eye on what she was doing."[6] She noted that there were times when Bridget would call her three times a day without remembering that they had previously spoken. Ms. Bransfield began overseeing Bridget's mail and finances to make sure all the

---

5. 6/18/13 Rita Greene Brief at 2.
6. 4/9/13 N.T. at 58.

bills were paid. Bridget confided in Ms. Bransfield about the details of her finances. She had accounts in 5 different banks totaling around $600,000 and owned her Frankford Avenue home. Bridget told Ms. Bransfield that she also had $800,000 in banks back in Ireland and showed the bank statements to Ms. Bransfield. At some point in 2009, the Irish account in Bridget Hasson's name was closed, and funds were transferred to an account in the name of both Bridget Hasson and Sheila Thompson. According to Ms. Bransfield, Bridget became "upset" in 2011 that she was no longer getting statements from that Irish account and she asked Ms. Bransfield as her agent to check with the bank in Ireland. Bransfield learned that the account was a demand account from which either holder could remove funds. Ms. Bransfield testified that Bridget became very upset when she learned that Sheila Thompson's name was on the account because she wanted her money ultimately to go to a charity and not a relative. 4/9/13 N.T. at 61-69. In fact, both Ms. Bransfield and Ms. Greene agreed that Bridget was adamant that she wanted her money to go to the needy poor not a greedy relative. 4/9/13 N.T. at 82 (Bransfield); 4/9/13 N.T. at 49-50 (Greene).

In late 2011, Ms. Bransfield flew Bridget back to Ireland for a wedding. Ms. Bransfield described Bridget at that time as being unable to pack for herself and as very confused. Once in Ireland, Bridget went to the bank and was told there was no money left in her account. According to Ms. Bransfield, bank personnel told her they did not think Bridget was competent to manage her finances. 4/9/13 N.T. at 69-74; Ex. D-2. When Ms. Bransfield returned to Ireland in December 2012, she contacted the police about the missing $800,000 and was told there was an ongoing investigation. 4/9/13 N.T. at 78-79 (Bransfield).

Bridget also told Ms. Bransfield about a lawsuit she had filed against Marilyn Hunt to recover on a $106,000 promissory note. She told Ms. Bransfield that "it didn't matter how much that cost, she wanted the case taken care of to the end. She wanted it played out to see it to the end because it was a severe injustice." 4/9/13 N.T. at 78 (Bransfield).

In addition to handling Bridget's finances, Ms. Bransfield also had Bridget's Frankford Avenue house cleaned out for which she paid her son, Michael Bransfield, $5,000 after obtaining comparable bids from others to clean out the house. Ms. Bransfield did not seek compensation for her work in 2010. When she took Bridget back to Ireland in 2011, she took compensation for the loss of 6 work days and travel expenses. 4/9/13 N.T. at 76-80. The account Ms. Bransfield filed of her actions as agent under the power of attorney reflects these disbursements. It also states that the amount of $630,979.83 is currently available. It states that because of their concern that unauthorized third parties were attempting to gain access to Bridget's funds a revocable living trust had been created on her behalf. *See* Account, Ex. P-8.

Bridget's other niece, Margaret Thompson, likewise testified that by 2011 she had observed a serious deterioration in Bridget's mental condition. She confirmed that Bridget had discovered upon her return to Ireland that her money had been moved. Out of concern for Bridget's risk of financial abuse, Margaret contacted Dr. Flynn to do a memory and competency assessment. According to Ms. Thompson, "Dr. Flynn talked to me on the phone after that examination and he said that she had really very little grasp of how much money she had or of her active

financial affairs. He felt that he needed to be protected by law for her." 4/9/13 N.T. at 125-26 (Thompson).

This testimony that Bridget was confused about her financial affairs was inadvertently confirmed by the often befuddled testimony of Rita Greene who claimed to have been granted a viable power of attorney by Bridget executed on January 23, 2013. Although the power of attorney was granted in January 2013, Ms. Greene testified that the last time she had seen Bridget was months before in September 2012. 4/9/13 N.T. at 42 (Greene). At that time, Bridget had wanted "to go bank to bank to bank of the banks that Bridget could remember she had accounts in to see if she had any accounts left." 4/19/13 N.T. at 43 (Greene). When asked if Bridget was capable of "understanding the nature and extent of her financial affairs," Ms. Greene replied: "I don't know if I'm capable of understanding the extent of her financial affairs, Mr. Candell." 4/9/13 N.T. at 25 (Greene). In contrast to the credible testimony by Ms. Bransfield that Bridget had confided in her the number and extent of her bank accounts in the United States, Ms. Greene testified that Bridget was unable to give her that type of detailed information. When asked about the nature of Bridget's accounts in Ireland, Ms. Greene replied:

A: Haven't been there. Don't do the books,. Can't say for sure what she has there, Mr. Candell.

Q: So you've never discussed how much she has in Northern Ireland?

A: It's not necessary for me to do that with her, Mr. Candell, because it's not about money for me.

Q: Are you aware of an account allegedly containing

$800,000?

A: The first time I heard of that was from you, and that was the last time that I spoke to you this arena.

4/9/13 N.T. at 26 (Greene)

Ms. Greene acknowledged that she had never gone over Bridget's finances nor taken part in her decisions of daily living. 4/9/13 N.T. at 37 (Greene). When asked who is looking after Bridget's money now, Ms. Greene testified: "I believe she and Geraldine wonder if she has any." 4/9/13 N.T. at 45 (Greene). Ms. Greene also testified in a deposition that Bridget had told her in effect "my memory isn't working" and that she had "accidentally sold her house." 4/9/13 N.T. at 34-35 (Greene).

In the absence of direct testimony by Bridget that would give insight into her understanding of the nature of the authority she was giving to Ms. Greene as well as the extent of the assets that would be subject to that authority, Ms. Greene's testimony is alarming. It is clear from that testimony that neither Ms. Greene—and by extension Bridget Hasson—understood the nature of the authority granted under the power of attorney nor the extent of the assets subject to it.

A further disturbing aspect of Ms. Greene's testimony is her admission that she had voluntarily testified against Bridget in her lawsuit against Marilyn Hunt to recover on a $106,000 promissory note. Her deposition answer as to why she testified on Marilyn Hunt's behalf is at once befuddled and revealing as to a profound conflict of interest. "I'm here because I think that Marilyn is being slandered beyond belief." When asked to elaborate, Rita

stated: 'I don't know what has happened. I don't know what took place, but I do know that there was never a time when Marilyn Hunt ever had any intention or ever in any way would take advantage of Bridget Hasson." 4/9/13 N.T. at 31-32 (Greene).

Based on this record, the power of attorney claimed by Rita Greene is invalid. It would be reckless for this court on this record to give her authority and control over Bridget Hasson's assets. Rita Greene's testimony displayed an ignorance of the most basic economic details. It was often incoherent, cavalier and combative especially when contrasted to Mary Bransfield's careful marshaling of economic details in her testimony and the account showing a balance of $630,979.83 available for Bridget Hasson.

On this record, however, the account may not be confirmed. Rita Greene's objections to the account cannot be considered first because she has no standing to object to the account since her power of attorney is invalid. Second, and more importantly, the account cannot be confirmed on the present record because the right of someone with standing to object to the account needs to be preserved. Although Ms. Greene raised objections to Mr. Bannon's attorney fees, for instance, her attorney appears to have waived those objections by failing to depose Mr. Bannon[7] who was unable to attend the hearing due to illness and by sending a letter dated April 15, 2013 which states: "Regarding Mr. Bannon's answer to our objections to the

---

7. Towards the conclusion of the hearing, counsel for Ms. Greene was given the option to depose Mr. Bannon as to his fees or to stipulate to the "Bannon time reference" by letter within fourteen days. 4/9/13 N.T. at 139-40.

account of Mary Bransfield, the information contained within the twenty four page itemized billing speaks for itself throughout. It is quite a Reply." The account therefore shall not be confirmed and will be returned unaudited.