Gillian *v.* Consolidated Foods Corp., Appellant.

Argued November 15, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused April 10, 1967.

*Nochem S. Winnet,* with him *Franklin A. Wurman, Charles M. Solomon,* and *Fox, Rothschild, O'Brien & Frankel,* for appellant.

*Murray C. Goldman,* for appellee.

OPINION BY MR. JUSTICE JONES, March 14, 1967:

David Gillian (Gillian), the sole owner of a business concern engaged in the sale of detergents under the name of "Uni-Clean Products" (Uni-Clean), on January 3, 1964, entered the employment of Consolidated Foods Corporation (Consolidated), pursuant to an oral agreement which he had negotiated with James R. Tyson (Tyson), vice-president and general manager of Consolidated. This oral agreement provided that Consolidated would purchase Uni-Clean's inventory for $2,500, assume certain of Uni-Clean's outstanding obligations and employ Gillian in a supervisory capacity in the L. H. Parke Division of Consolidated at a salary of $15,000 per year plus $3,000 expenses and 3% commissions on certain sales and certain fringe benefits.

After entering upon such employment, Gillian became concerned that he did not have a fixed term of employment, it being his desire to secure a five-year term of employment. On February 17, 1964, Gillian entered into an agreement in writing with Consolidated, this agreement being signed by Tyson on behalf of Consolidated. This agreement recited that in consideration of "annual remuneration . . . in the amount of $15,000 salary and $3,000 expenses plus a 3% commission of all Uni-Clean detergent sales", Gillian would cease any activity in the name of Uni-Clean and give to Consolidated unlimited use of the brand name "Uni-Clean". The agreement contained no mention of any fixed term of employment. Gillian bases his claim on this written agreement as well as an oral agreement with Tyson.

On September 11, 1964, Consolidated, acting through Tyson, discharged Gillian from its employment assigning as the reason therefor the necessity of reducing business operation costs.

Gillian then instituted an equity action in the Court of Common Pleas of Philadelphia County against Consolidated seeking (a) restraint of Consolidated from using the name "Uni-Clean", (b) an accounting by Consolidated of all profits arising from its use of the name "Uni-Clean" and a direction that Consolidated pay over to Gillian any amount found to be due, (c) that Consolidated pay over $7,615.30 with interest to Gillian and (d) such other relief as might be deemed proper. Upon issue joined, the matter was heard by Judge JAMES T. MCDERMOTT. After hearing, the chancellor found (1) that Gillian was employed, under an oral and written contract, for one year commencing February 17, 1964, (2) that Gillian was wrongfully discharged on September 11, 1964, and (3) that Gillian sought to mitigate the damages but such efforts were unsuccessful. Upon such findings, the chancellor awarded Gillian damages from September 11, 1964 to February 17, 1965 in the amount of salary Gillian would have received during such period plus interest—$6,-863.77—and directed Consolidated to account to Gillian for all sales under the written contract during the period from February 17, 1964 to February 17, 1965. Exceptions to the chancellor's adjudication having been dismissed by the court en banc and a final decree entered, an appeal was taken to the Superior Court which certified the appeal to this Court.

Consolidated presents six questions on this appeal: (a) whether Gillian has shown Tyson's authority to bind Consolidated to the alleged contract of employment? (b) whether there was any credible evidence to warrant a finding of a one-year employment contract? (c) whether there was any credible evidence to warrant a finding of a one-year employment contract commencing on February 17, 1964? (d) whether there was a sufficient evidentiary basis for the chancellor's finding that, prior to his employment by Consolidated,

Gillian had been engaged in a profitable business? (e) where, on his own account, Gillian, subsequent to his discharge, made sales, should not the amount of any profit from such sales be taken into consideration in mitigation of damages? (f) in urging a settlement in an amount exceeding Consolidated's liability did the chancellor err?

The burden of proving the authority of Tyson to act for Consolidated was upon Gillian: *Shay v. Schrink*, 335 Pa. 94, 97, 6 A. 2d 522 (1939); *Mallisee v. Hawkins*, 322 Pa. 58, 59, 185 A. 230 (1936) and authorities therein cited. While the question of the extent of an agent's authority is for the court to determine where the fact of agency depends on a written agreement (*Singer Mfg. Co. v. Christian*, 211 Pa. 534, 540, 60 A. 1087 (1905), yet where the "authority is to be implied from the conduct of the parties, or where the agency is to be established by witnesses, the fact [of agency] and scope of the agency are for the [trier of facts]": *Singer Mfg. Co. v. Christian*, supra, p. 540; *Exner v. Gangewere*, 397 Pa. 58, 61, 152 A. 2d 458 (1959) and authorities therein cited.

Tyson was not only a vice-president but the general manager of the Parke division of Consolidated. "The term 'manager', as applied to an officer of a corporation, conveys the idea that the management of the affairs of the company has been committed to the one thus named, and one dealing with a person so held out may assume that his acts are authorized *so long as they pertain to the ordinary business of the company*": *Bush v. Atlas Auto. Finance Corp.*, 129 Pa. Superior Ct. 459, 465, 195 A. 757 (1937). (Emphasis supplied) In *Kelly, Murray, Inc. v. L.B. & T. Co.*, 299 Pa. 236, 242, 149 A. 190 (1930), we quoted with approval the following statement in 14A, C.J. 359, 360: "The fact that he occupies the position of general or managing agent implies, without further proof, his authority to do any-

thing that the corporation itself may do so long as the act done *pertains to the ordinary business of the corporation*". See: Restatement 2d, Agency, §73; *Faiola v. Calderone,* 275 Pa. 303, 306, 119 A. 539 (1923).

"The powers of an agent are particularly broad in the case of one acting as a general agent or manager; such a position presupposes a degree of confidence reposed and investiture with liberal powers for the exercise of judgment and discretion in transactions and concerns which are incidental or appurtenant to the business entrusted to his care and management. In the absence of an agreement to the contrary, a managing agent may enter into any contracts that he deems reasonably necessary or requisite for the protection of the interests of his principal entrusted to his management. He may engage and supervise such employees as may be required and he may direct the ordinary operations of the business . . . .": 3 Am. Jur. 2d Agency, §86, p. 489.[1]

Tyson testified:[2] ". . . I told Mr. Gillian that we don't give contracts in our corporation, that I have no contract, and we are not going to give him a contract. . . . Q. When you say 'contract', what do you have in mind? What type of contract? A. An employment contract such as would spell out the terms, conditions, requirements and limitations and those things that are accepted of a contract of an employment nature."

By virtue of his title and corporate position, Tyson had, at least, the apparent authority to enter into a

---

[1] In this connection, it must be noted that Consolidated did not present any evidence by way of corporate memoranda to show any limitation on Tyson's authority as manager to enter into a one-year or any fixed term contract of employment.

[2] That an agent can testify to the extent of his authority is well settled: *Isaac v. Donegal & Conoy Mutual Fire Ins. Co.*, 301 Pa. 351, 354, 152 A. 95 (1930).

one-year contract of employment. That he had the authority to employ and discharge the personnel in his division of Consolidated is uncontradicted; in fact, it was he who discharged Gillian from employment and his authority to do so is unquestioned. That Tyson had the authority to purchase a business and its assets and to assume liability for its outstanding obligations is undisputed. True it is that Tyson disclaimed the authority to enter into a contract of employment of a year's duration; however, the credibility of Tyson was for the fact finder, i.e., the chancellor in this instance, (*Girsh Trust*, 410 Pa. 455, 471, 189 A. 2d 852 (1963) and cases therein cited) and the chancellor, having seen and heard Tyson, characterized his testimony as "most unsatisfactory" and his "manner and demeanor evasive".

From this record, we are satisfied that Gillian has shown, under the circumstances, that Tyson had authority to make a one-year contract of employment. The employment and discharge of personnel certainly falls within the ordinary and commonplace business of a corporation and within the normal and natural competency of a general manager. Particularly is this so when the general manager, concededly, has the authority to purchase other businesses, assume their liabilities and employ their personnel as well as fixing the remuneration of even top level personnel. Our review of this record reveals evidence sufficient in nature to justify a finding of authority in Tyson to employ Gillian for one year. *Leonard v. American Stores Co.*, 131 Pa. Superior Ct. 14, 198 A. 524 (1938) and *DeForest v. Northwest Townsite Co.*, 241 Pa. 78, 88 A. 293 (1913), upon which Consolidated relies, are factually inapposite to the instant case.

We next consider whether the contract of employment was for a year commencing on February 17, 1964. Consolidated bases its contention upon the hornbook

rule that, absent contrary facts and circumstances, a contract of employment that states a fixed sum *per annum* or "annual remuneration" does not raise a presumption that the term of employment is for a term of one year[3] and it concludes that there was only an oral agreement of a hiring at will since there were no circumstances to demonstrate otherwise. This Court has stated, in determining whether an employment contract is for a definite term: ". . . it is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement.": *Slonaker v. P. G. Publishing Co.,* 338 Pa. 292, 296, 13 A. 2d 48 (1940); *Lubrecht v. Laurel Stripping Co.,* 387 Pa. 393, 396, 127 A. 2d 687 (1956). See also: *Weidman v. United Cigar Stores Co.,* 223 Pa. 160, 161, 72 A. 377 (1909).

The basic object of the agreements and negotiations of Tyson vis-a-vis Gillian was the absorption by Consolidated of Uni-Clean into its corporate structure and to make the supply and sale of detergents more profitable by distribution through the established national outlets of Consolidated. The consideration that passes to Gillian consisted of certain cash, the assumption of certain liabilities and his employment in supervisory capacity. To adopt Consolidated's construction of the purpose of the employment contract and the intention of the parties would be unrealistic; it would permit Consolidated to discharge Gillian at its whim and at any time for any reason after Gillian had sold his entire business to it, a construction which not only negates the real purpose of the oral agreement and

---

[3] See: 35 Am. Jur. Master and Servant §20, pp. 458, 459; Restatement 2d, Agency, §442, comment b, pp. 339, 340.

subsequent written contract, but ignores the common sense of the transaction. Gillian testified that the purpose behind his execution of the February 17, 1964 agreement was to sell Uni-Clean and secure employment on an annual basis by Consolidated. The record facts and circumstances are sufficient to rebut the presumption that the Tyson-Gillian understanding contemplated simply a hiring at will of Gillian. The evidence discloses that Gillian did not accept as his primary consideration for the sale of his business an employment at will that conceivably could terminate in a few days or a few weeks. The circumstances surrounding this entire transaction rebut a hiring at will and establish a fixed employment contract for one year.

The employment contract commenced on February 17, 1964, the date of the written agreement. Gillian, whom the court believed, testified that, prior to that date, he had not been employed for a fixed term, and his employment for a year arose from the negotiations leading up to and including the written agreement. That being so, if a one-year employment contract did exist, a fortiori it began on February 17, 1964. The chancellor, placing his imprimatur of credibility on Gillian, found, upon evidence sufficient quantitatively and qualitatively, that Tyson and Gillian had agreed upon the employment of the latter for one-year dating from February 17, 1964. Such finding, approved by the court en banc, is binding upon us.

Next, Consolidated suggests that the chancellor erred in placing "great weight upon the purported fact that 'the business that [Gillian] was engaged in was a profitable one' (206a)"[4] inasmuch, as Consolidated claims, there was no evidence that the business was profitable. We find that the chancellor did not make

---

[4] Consolidated's brief, pp. 14, 15.

the statement with which he is charged. What the chancellor did state was that it was "an almost necessary inference, that the employment . . ., was part of the consideration on which the total agreement rested. If the business that [Gillian] was engaged in had been a profitable one, it is hardly probable that he would have been content to give it up for simply the value of his machinery and the relief from a business obligation. *If* not a business success, it is not probable that [Consolidated] would be desirous to place a man who had failed to make a success of a local venture in charge of a venture which both parties expected to become successful on a nationwide scale. So far as the future employment entered into the contract, it was of the largest concern to him who was to be employed." (Emphasis supplied) We find no error in that which the chancellor stated or in his reliance on such inference; on the contrary, the inference which the chancellor drew was entirely rational and sound under the circumstances presented.

Moreover, Consolidated argues that, although the chancellor permitted evidence of Uni-Clean's gross sales over a three-year period and testimony as to Uni-Clean's obligations when Gillian entered upon his employment with Consolidated, the chancellor would not permit inquiry by Consolidated's counsel with respect to Gillian's financial situation at the time he made the original oral agreement. In support of this argument, Consolidated points to a question its counsel addressed to Gillian concerning an alleged default in his accounts with National Milling Company. A reference to the record clearly indicates that the chancellor did permit Gillian to be questioned on this subject and that Gillian testified that he owed National Milling Company $4,700, that he had a $5,000 credit at a named bank to cover for anything he owed and that he had a 60 day arrangement for the payment of this

account.[5]  The record does not support this argument of Consolidated.

Consolidated contends that the chancellor erred in, what it terms, "pressuring" for a settlement of the litigation in an amount in excess of Consolidated's possible liability.  The record indicates that, when Gillian closed his case, counsel for Consolidated moved for a mistrial on the ground that, at a conference in chambers *which is not reported of record,* the chancellor stated to Tyson "that he had better pay $5,000 in settlement of this case before a finding could or would be entered in a greater amount" and that, in Consolidated's counsel's view, such suggested amount exceeded the amount of any possible maximum recovery.  In denying the motion, the chancellor stated that he at no time instructed Tyson that he had better do anything but simply suggested that "there were certain methods that he might employ to avoid further litigation and he chose to reject them:".  We accept the chancellor's version of this unreported matter and we reject as entirely without merit this contention.

Lastly, it is urged that the chancellor failed to take into consideration any profits which might have been realized by Gillian, during the period from September 11, 1964 to February 17, 1965, in mitigation of damages.  Gillian testified that, subsequent to his discharge by Consolidated, he operated his own commercial detergent business; in September, October and November, 1964, his sales approximated $1,700, the profit on which aggregated $300-$400 or 30% of the sales; that further sales were made in December 1964 and January and February 1965.  There was no testimony as to profits, if any, made on such later sales.[6]  On the

---

[5] Record pp. 58a, 59a.

[6] Consolidated's claim of double payments in connection with the purchase of Uni-Clean is not record-supported.

theory that Consolidated had failed to carry its burden of showing that, if Gillian, after his discharge, had used reasonable efforts to secure employment, such employment would have been available, (*Savitz v. Gallaccio,* 179 Pa. Superior Ct. 589, 595, 118 A. 2d 282 (1955), the chancellor did not consider the question of mitigation. Our reading of the record indicates that Gillian's own testimony revealed he did earn money after his discharge from employment and that any profits from the sales of detergents should have been taken into consideration in arriving at the amount of an appropriate award. For this reason, the decree must be vacated and the matter remanded to the court below solely to determine the extent of profits, if any, realized from the sale of detergents by Gillian during the period from September 11, 1964 to February 17, 1965, and, upon such determination made, to credit Consolidated with the amount of such profits, if any, in arriving at the amount of the award to Gillian.

Decree vacated and the matter remanded to the court below for proceedings consistent with the views expressed in this opinion. Consolidated pay costs.